**VETERANS FOR COMMON SENSE
and Veterans United for Truth,
Inc., Plaintiffs,**

v.

**James B. PEAKE, Secretary of Veterans Affairs, United States Department of Veterans Affairs; James P. Terry, Chairman, Board of Veterans Appeals; Daniel L. Cooper, Under Secretary, Veterans Benefits Administration; Bradley G. Mayes, Director, Compensation and Pension Service; Dr. Michael J. Kussman, Under Secretary, Veterans Health Administration; Pritz K. Navara, Veterans Service Center Manager, Oakland Regional Office, Department of Veterans Affairs, United States of America, Defendants.**

No. C–07–3758 SC.

United States District Court,
N.D. California.

June 25, 2008.

Roche's argument that the patents include unpatentable subject matter under section 101.

1050

Melissa Wendy Kasnitz, Jennifer Weiser Bezoza, Katrina Kasey Corbit, Sidney M. Wolinsky, Disability Rights Advocates, Berkeley, CA, Arturo J. Gonzalez, Heather A. Moser, Stacey Michelle Sprenkel, Morrison & Foerster LLP, San Francisco, CA, Gordon P. Erspamer, Morrison & Foerster, Paul Joseph Taira, Walnut Creek, CA, William Daniel Janicki, Attorney at Law, Sacramento, CA, for Plaintiffs.

Daniel Bensing, Steven Yale Bressler, James Schwartz, Kyle Renee Freeny, Ronald J. Wiltsie, U.S. Dept. of Justice, Washington, DC, Judith Z. Gold, Derek F. Knerr, Jeffrey Akira Finucane, Heller Ehrman LLP, San Francisco, CA, for Defendants.

## MEMORANDUM OF DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL CONTI, District Judge.

### I. INTRODUCTION

As a preliminary summary to this decision, the Court concludes: In reviewing each of the items of relief requested by Plaintiffs, the grievances of Plaintiffs are misdirected. The remedies to the problems, deficiencies, delays and inadequacies complained of are not within the jurisdiction of this Court. Rather, this authority lies with Congress, the Secretary of the Department of Veterans Affairs ("VA"), the adjudication system within the VA, and the Federal Circuit. Congress has bestowed district courts with limited jurisdiction. Congress has specifically precluded district courts from reviewing veterans' benefits decisions and has entrusted decisions regarding veterans' medical care to the discretion of the VA Secretary. The Court can find no systemic violations system-wide that would compel district court intervention. The broad injunctive relief that Plaintiffs request is outside the scope of this Court's jurisdiction. The statutes and caselaw are quite clear as to the extent of this Court's authority. Among them is 38 U.S.C. § 511, which states in part: "The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to Veterans or the dependents or survivors of veterans.... [T]he decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court...."

In addition, 38 U.S.C. § 1710(a)(1) provides that the medical care veterans receive is to be determined by the Secretary, and under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, judicial review is prohibited where actions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). For the foregoing and following reasons, Plaintiffs' requested relief is DENIED. The Court now proceeds with its finding of facts and conclusions of law.

### II. BACKGROUND

Veterans for Common Sense and Veterans for Truth ("Plaintiffs") are non-profit organizations devoted to improving the lives of veterans. Plaintiffs filed the present lawsuit in July 2007, seeking declaratory and injunctive relief against the VA, alleging that the manner in which the VA provides mental health care and the procedures for obtaining veteran disability benefits violate various statutory and constitutional rights. Plaintiffs' Complaint seeks

declaratory relief for the following: (1) denial of due process in violation of the Fifth Amendment; (2) denial of access to the courts in violation of the First and Fifth Amendments; (3) violation of 38 U.S.C. § 1710(e)(1)(D) relating to medical care for returning veterans; and (4) violation of Section 504 of the Rehabilitation Act. Compl., Docket No. 1, ¶¶ 258–72. In addition, Plaintiffs' fifth cause of action seeks injunctive relief. *Id.* ¶¶ 273–78.

On January 10, 2008, this Court issued an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("Motion to Dismiss Order"). Docket No. 93. In that Order, the Court held that Plaintiffs' first, second, and third claims survived Defendants' various challenges, including standing, sovereign immunity, and subject matter jurisdiction. The Court dismissed Plaintiffs' fourth claim.

After Defendants submitted their Motion to Dismiss, Plaintiffs filed a Motion for Preliminary Injunction. Docket No. 88. The Court scheduled a hearing on this motion and from March 3 through March 6, the Court heard testimony and received evidence. At the close of the hearing, in light of the issues raised by Plaintiffs and the importance of addressing Plaintiffs' allegations promptly, the Court continued the matter and set an expedited schedule for discovery and for consideration of Plaintiffs' Request for Permanent Injunction and Declaratory Relief. A bench trial was then held from April 21 through April 30, 2008.

After hearing testimony and argument during almost three weeks of trial and reviewing the parties' voluminous submissions, two things have become clear to the Court: the VA may not be meeting all of the needs of the nation's veterans, and the remedies proposed by Plaintiffs are beyond the power of this Court.

## III. *LEGAL FRAMEWORK*

### A. *Standing*

 An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

 For Plaintiffs' members to have standing to sue in their own right, they must satisfy three elements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical. . . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (internal quotation marks, citations, and alterations omitted). "Since [these elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. Thus, at the final stage of

the proceedings, any disputed facts "must be supported adequately by the evidence adduced at trial." *Id.* at 561, 112 S.Ct. 2130 (internal quotation marks omitted).

## B. *Sovereign Immunity*

 "The United States must waive its sovereign immunity before a federal court may adjudicate a claim brought against a federal agency." *Rattlesnake Coalition v. U.S. Envtl. Prot. Agency,* 509 F.3d 1095, 1103 (9th Cir.2007) (citing *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980)). As discussed in the Conclusions of Law, various of Plaintiffs' challenges fail because of the lack of a valid waiver of sovereign immunity. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, provides such a waiver in certain circumstances and "permits a citizen suit against an agency when an individual has suffered 'a legal wrong because of agency action' or has been 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Id.* (quoting 5 U.S.C. § 702). "This provision contains two separate requirements." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). "First, the person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion...." *Id.* Second, "the party seeking review under § 702 must show that he has suffered legal wrong because of the challenged agency action or is adversely affected or aggrieved by that action within the meaning of the relevant statute." *Id.* at 883, 110 S.Ct. 3177 (internal quotation marks omitted).

### 1. Agency Action

"Agency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act...." 5 U.S.C. § 551(13). The APA defines "agency rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." *Id.* § 551(4).

As an initial matter, Plaintiffs argue that their constitutional claims are not limited by the requirement that they challenge an agency action. In support of their argument, they rely on *Presbyterian Church v. United States,* 870 F.2d 518 (9th Cir.1989). In analyzing whether there was valid waiver of sovereign immunity, the court in *Presbyterian Church* held that "§ 702's waiver of sovereign immunity is not limited to suits challenging 'agency action.'" *Id.* at 525 n. 8.

Although *Presbyterian Church* has not been overruled, its vitality has been called into question. As this Court noted in its Motion to Dismiss Order, in *Gallo Cattle Co. v. Department of Agriculture,* 159 F.3d 1194 (9th Cir.1998), the Ninth Circuit held that "the APA prescribes standards for judicial review of an agency action...." *Id.* at 1198. The tension between *Presbyterian Church* and *Gallo Cattle* was recognized in *Gros Ventre Tribe v. United States,* 469 F.3d 801 (9th Cir.2006), where the court stated:

> Under *The Presbyterian Church,* § 702's waiver is not conditioned on the APA's "agency action" requirement. Therefore, it follows that § 702's waiver cannot then be conditioned on the APA's "final agency action" requirement.... But that is directly contrary to the holding in *Gallo Cattle* where we stated that "the APA's waiver of sovereign immunity contains several limitations," including § 704's final agency action requirement.

*Id.* at 809 (citing *Gallo Cattle,* 159 F.3d at 1198). Although the court in *Gros Ventre* declined to resolve the conflict between the

two cases, it did note that it "saw no way to distinguish *Presbyterian Church* from *Gallo Cattle.*" *Id.* at 809. Plaintiffs urge that the court in *Gros Ventre* "may have been mistaken in suggesting that [these two cases] are not distinguishable." Pls.' Post–Trial Br., Docket No. 229, at 6. Plaintiffs argue that because *Presbyterian Church* dealt with constitutional violations, while *Gallo Cattle* addressed statutory violations, it should be inferred that constitutional claims are not constrained by the requirement that a plaintiff, for a valid waiver of sovereign immunity under the APA, challenge an agency action.

Plaintiffs' argument fails for several reasons. First and foremost, the Ninth Circuit found this distinction unremarkable and held that the cases were not distinguishable. *Gros Ventre*, 469 F.3d at 809. This Court is constrained by that holding. Second, the court in *Presbyterian Church* did not rely on the fact that the claims before it were constitutional, rather than statutory. *See Presbyterian Church*, 870 F.2d at 524–26. If such a distinction were meaningful, as Plaintiffs suggest, then the court would have so noted. Instead, in reaching its conclusion about the limits of § 702's waiver, the court relied on the legislative history and on the plain language of the statute itself. *Id.*

■ Third, subsequent to *Presbyterian Church,* the Supreme Court decided *National Wildlife Federation.* In *National Wildlife Federation,* the Court made clear that waiver of sovereign immunity under § 702 is constrained by the provisions contained in § 704. The Court stated: "[T]he person claiming a right to sue [under § 702] must identify some 'agency action' that affects him in the specified fashion...." 497 U.S. at 882, 110 S.Ct. 3177.

The Ninth Circuit, more recently, reiterated this proposition, holding that when a suit is brought against an agency pursuant to a waiver of sovereign immunity under the APA, the suit must challenge agency action. *Rattlesnake Coalition*, 509 F.3d at 1103. Finally, the Court notes that it has already ruled on this issue, stating, in its Motion to Dismiss Order, that "waiver of sovereign immunity under § 702 of the APA is limited by § 704." Mot. to Dismiss Order at 10. Nonetheless, as Plaintiffs raised a new argument in their Post–Trial Brief, the above discussion was warranted. For these reasons, Plaintiffs must challenge an "agency action" to establish a valid waiver of sovereign immunity.

In addition, when a claim is brought pursuant to the general review provisions of the APA, rather than under a private right of action or authorization for judicial review under a substantive statute, "the 'agency action' in question must be 'final agency action.'" *Nat'l Wildlife Fed'n,* 497 U.S. at 882, 110 S.Ct. 3177 (quoting 5 U.S.C. § 704[1]); *see also Rattlesnake Coalition,* 509 F.3d at 1103; *Ecology Ctr. v. U.S. Forest Serv.,* 192 F.3d 922, 925 (9th Cir.1999). Neither party argues that the agency action in question is made reviewable by any statute. Accordingly, the additional limitations of § 704 also apply to the present case, and Plaintiffs must show that the agency action they challenge is not only "final agency action" but also that there is no adequate alternative remedy. 5 U.S.C. § 704; *Nat'l Wildlife Fed'n,* 497 U.S. at 882, 110 S.Ct. 3177; *Gallo Cattle,* 159 F.3d at 1198.

■ Finally, the APA provides that a "reviewing court shall compel agency action unlawfully withheld or unreasonably

---

**1.** Section 704 states, in part, that only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court, are subject to judicial review."

delayed." 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 64, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (emphasis in original). "Review of an agency's failure to act has been referred to as an exception to the final agency action requirement." *Ctr. for Biological Diversity v. Abraham,* 218 F.Supp.2d 1143, 1157 (N.D.Cal.2002). "Courts have permitted jurisdiction under the limited exception to the finality doctrine only when there has been a genuine failure to act." *Ecology Ctr.,* 192 F.3d at 926. The Ninth Circuit "has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action dressed up as an agency's failure to act." *Id.* (internal quotation marks omitted).

### a. Final Agency Action

■ An agency action is "final" under the APA where two conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process . . .—it must not be of a merely tentative or interlocutory nature," and (2) the action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations and quotation marks omitted).

### b. Adequate Alternative Remedy

In addition to final agency action, § 704 also requires that "there is no other adequate remedy in a court" for there to be a valid waiver of sovereign immunity under the APA. 5 U.S.C. § 704.

### 2. Legal Wrong/Adverse Effect

■ "[T]he party seeking review under § 702 must [also] show that he has suf-fered legal wrong because of the challenged agency action or is adversely affected or aggrieved by that action within the meaning of the relevant statute." *Nat'l Wildlife Fed'n,* 497 U.S. at 883, 110 S.Ct. 3177 (internal quotation marks omitted). Neither party disputes that this prong of APA waiver of sovereign immunity is satis-.fied.

### C. *Jurisdictional Limitations of the VJRA*

The VJRA contains several statutory provisions that preclude review of various challenges to the VA in federal district courts. Although this issue was also dealt with extensively in the Motion to Dismiss Order, it too must be revisited.

### 1. § 502

Pursuant to 38 U.S.C. § 502, "VA rulemaking is subject to judicial review only in the Federal Circuit." *Chinnock v. Turnage,* 995 F.2d 889, 893 (9th Cir.1993); *see also Preminger v. Principi,* 422 F.3d 815, 821 (9th Cir.2005) (stating "Congress has explicitly provided for judicial review of direct challenges to VA rules and regulations only in the Federal Circuit"). Thus, any challenge by Plaintiffs to VA regulations is not reviewable in this Court.

### 2. § 511

■ 38 U.S.C. § 511 states, in part:

The Secretary [of Veterans Affairs] shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by

any court, whether by an action in the nature of mandamus or otherwise.

38 U.S.C. § 511(a). As previously held by various courts, including this one in its Motion to Dismiss Order, § 511 does not strip district courts of the ability to hear facial constitutional challenges to the VA benefits system. *See* Mot. to Dismiss Order at 20–30; *see also Larrabee by Jones v. Derwinski*, 968 F.2d 1497, 1501 (2d Cir. 1992) (stating "district courts continue to have jurisdiction to hear facial challenges of legislation affecting veterans' benefits") (internal quotation marks and emphasis omitted); *Broudy v. Mather*, 460 F.3d 106, 114 (D.C.Cir.2006) (stating "district courts have jurisdiction to consider questions arising under laws that affect the provision of benefits as long as the Secretary has not actually decided them in the course of a benefits proceeding"); *Beamon v. Brown*, 125 F.3d 965, 972–73 (6th Cir.1997) (stating "district court jurisdiction over facial challenges to acts of Congress survived the statutory revisions that established the CVA").

Thus, while review of individual benefits decisions is clearly precluded by § 511, facial constitutional challenges are not. In addition, as this Court held in its Motion to Dismiss Order, where Plaintiffs challenge VA decisions that were made outside the course of a benefits proceeding, § 511 does not necessarily preclude review in this Court. For reasons discussed below, however, it is unnecessary to determine the precise contours of § 511's preclusive effect. Suffice it to say, § 511 does not provide the extremely broad preclusive effect advocated by Defendants.

**D. *Due Process***

**1. Delay**

■■■■ Under the APA, a district court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5

U.S.C. § 706(1). In assessing whether agency action has been unreasonably delayed or withheld, courts look to the so-called *TRAC* factors. *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir.1997). These factors are:

(1) the time agencies take to make decisions must be governed by a "rule of reason" [;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason [;] (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake [;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Id.* at 507 n. 7 (quoting *Telecomms. Research & Action v. F.C.C.*, 750 F.2d 70, 79–80 (D.C.Cir.1984)) (modifications in original).

**2. Other Due Process Violations**

■■■■ Plaintiffs also argue that the medical clinical appeals process and the benefits adjudication process violate veterans' Due Process rights under the Fifth Amendment. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In evaluating whether a procedure satisfies Due Process, courts balance (1) the private interest, (2) the risk of erroneous deprivation and the probable value, if any, of extra

safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or procedural requirement would entail. *Id.* "Procedural due process requires adequate notice and an opportunity to be heard." *Kirk v. U.S. Immigration and Naturalization Serv.*, 927 F.2d 1106, 1107 (9th Cir.1991). It does not, however, "always require an adversarial hearing." *Hickey v. Morris*, 722 F.2d 543, 549 (9th Cir.1983).

## IV. FINDINGS OF FACT

1. Plaintiffs are two non-profit organizations that represent the interests of veterans. RT 661:10–666:10; 811:20–812:6.[2] Veterans United for Truth is an advocacy organization with between 1,200 and 1,300 members hailing from 40 states. *Id.* 661:11–13; 664:20; 665:18–19. A large percentage of these members are enrolled with the VA, many of them suffer from a service-connected disability, including Post Traumatic Stress Disorder ("PTSD"), and many have sought benefits within the VA. *Id.* 665:22–666:7; 674:1–4. Veterans for Common Sense, based in Washington D.C., represents approximately 12,000 members. *Id.* 811:20–812:1. Among these ranks are members who receive services from the VA for mental health issues, including those who have received treatment from the VA for depression and PTSD, and members who have served in Iraq or Afghanistan. *Id.* 813:24–814:9. In addition, within the last year, members of Veterans for Common Sense have experienced problems with delays in processing benefits claims and delays in receiving health care. *Id.* 813:17–19; 815:4–816:16. Veterans for Common Sense devotes more than half of

its resources to advocating for better veterans' health care and benefits. *Id.* 813:12–16.

2. The mission of the VA is: "To care for him, who has borne the battle and for his widow and for his orphan." PIRT 245:4–6. Defendants concede that the VA not only has a "broad obligation," but also a "moral imperative [ ] to provide medical care to the men and women who have served our country." Defs.' Proposed Findings of Fact and Conclusions of Law ("Defs.' Post–Trial Brief"), Docket No. 230, at 11.

3. The VA has approximately 230,000 employees and 1,400 sites of care. RT 778:19–24. The VA is comprised of three major organizations: the Veterans Health Administration ("VHA"), the Veterans Benefits Administration ("VBA"), and the National Cemetery Administration ("NCA"), only the first two of which are relevant to the present case.

4. There are approximately 25 million veterans in the United States today. Ex. 1247.[3] As of May 2007, between 5 and 8 million of these veterans were enrolled with the VA. PIRT 254:23; Exs. 133, 357.

5. On any given night in the United States, it is estimated that 154,000 veterans are homeless. RT 503:19–20.

### A. Veterans Health Administration

6. The VHA, one of the largest healthcare systems in the world, is divided into approximately 21 geographical areas called Veteran's Integrated Service Networks ("VISNs"). PIRT 623:16–17; RT 703:1. Each VISN contains a number of VA hospitals, also known as medical centers, of

---

2. "RT" refers to the transcript of record from the trial, held April 21–30, 2008. "PIRT" refers to the transcript of record from the preliminary injunction hearing held March 3–6, 2008.

3. Unless otherwise noted, all exhibits refer to Plaintiffs' Trial Exhibits.

which there are 153 throughout the country. PIRT 245:17; 246:6; 623:16–17. Each VISN also has numerous community-based outpatient clinics ("CBOCs"), of which, nationwide, there are approximately 800. *Id.* 247:2–7. CBOCs typically provide, at a minimum, primary health care. *Id.* 247:10–11. Most veterans enrolled in the VA receive their care at CBOCs. Ex. 357; RT 1318:15–17.

7. The VHA also has approximately 200 Readjustment Counseling Centers, known as "Vet Centers." PIRT 247:24–25. Vet Centers are small, community-based counseling centers, with average staff sizes of four to six people. *Id.* 55:7–9.

### 1. Veterans' Mental Health and Suicide Rates

8. More than 1.6 million men and women have served in Iraq and/or Afghanistan since October 2001. Answer, Docket No. 110, ¶ 7; Ex. 1253 at iii. As of December 31, 2007, 803,757 veterans of Iraq and Afghanistan were eligible for VA health care. Answer ¶ 7; Ex. 420 at 5. Defendants concede that veterans have complained of long wait times for PTSD treatment and difficulties in obtaining mental health care in rural areas. Answer ¶ 10.

9. Approximately one out of every three soldiers returning from Iraq was seen in the VA for a mental health visit within a year of their return. RT 220:7–11; PIRT 219:3–220:17. PTSD is a leading diagnosis for the mental health disorders of veterans returning from Iraq. PIRT 216:17.

10. Dr. Arthur Blank testified for Plaintiffs as an expert in psychiatry, specializing in treatment of veterans with mental health problems, including PTSD. PIRT 59:23–62:3. Dr. Blank spent 10 years as a teaching and supervising psychiatrist at the Westhaven VA Medical Center, was a national director of the Vet Centers at the VA headquarters in Washington from 1982–1994, and was the chief psychiatrist on the PTSD team at the Minneapolis VA from 1994–1997. *Id.* 54:19–25; 55:1–3; 57:18–23.

11. Dr. Blank testified that PTSD is a "psychological condition that occurs when people are exposed to extreme, life-threatening circumstances, or [when they are in] immediate contact with death and/or gruesomeness, such as [what] occurs in combat, severe vehicular accidents or natural disasters. It produces a complex of psychological symptoms which may endure over time." PIRT 62:25–63:6.

12. Dr. Gerald Cross, the Deputy Under Secretary for Health in the VA, testified that the high rates of PTSD among Iraq veterans are the result of various factors, including multiple deployments, the inability to identify the enemy, the lack of real safe zones, and the inadvertent killing of innocent civilians. PIRT 216:23–218:2.

13. In 2008, Dr. Robert Rosenheck, Director of VA's Northeast Program Evaluation Center ("NEPEC"), issued a report entitled "Recent Trends in VA Treatment of Post–Traumatic Stress Disorder and other Mental Disorders." Exs. 442, 444. The report found that during 2003–2005, there was a 232% increase of PTSD diagnosis for veterans born after 1972. Ex. 442 at 1722. In addition, while the number of veterans diagnosed with PTSD doubled between 1997 and 2005, "the number of clinic contacts per veteran per year declined steadily and relatively uniformly across the years." *Id.* at 1722, 1723.

14. A study released on April 17, 2008, by the RAND Corporation found that 18.5% of U.S. service members who have returned from Iraq and Afghanistan currently have PTSD. Ex. 1191 at 1. The RAND study also found that approximate-

ly half of those who need treatment for PTSD seek it, and of those who actually receive treatment, only slightly more than half get "minimally adequate care." *Id.* The study estimates that 300,000 soldiers now deployed to Iraq and Afghanistan "currently suffer PTSD or major depression." Ex. 1253 at xxi.

15. Studies indicate that the suicide rate among veterans is significantly higher than that of the general population. RT 274:15–275:19. One study, the "Katz Suicide Study," dated February 21, 2008, found that suicide rates among veterans are approximately 3.2 times higher than the general population. *Id.;* Ex. 1183.

16. Dr. Stephen Rathbun, the interim head of the Department of Epidemiology and Biostatistics at the University of Georgia, testified as Plaintiffs' expert in biostatistics. PIRT 303:13–18. Dr. Rathbun analyzed data provided to him by CBS News and concluded that, in 2005, the last year for which suicide data was available, the suicide rate among male veterans aged 20 to 24 years old was three or four times the non-veteran rate in that group. *Id.* 304:11–17; 307:1; 310:9–311:2. Internal VA emails state that Dr. Rathbun's methodology was "defensible" and "appears to be correct." Exs. 1306, 1248.

17. Dr. Ira Katz, Deputy Chief of Patient Care Services Office for Mental Health for the VA, testified that his primary job is to direct mental health services at the VA. PIRT 736:24–25. Suicide prevention is an important component of his job. *Id.* 738:21–24.

18. Dr. Katz, in an internal VA email dated December 15, 2007, wrote that "[t]here are about 18 suicides per day among American's 25 million veterans." Ex. 1247. The email further states that the "VA's own data demonstrate 4–5 suicides per day among those who receive care from us." *Id.*

19. In another internal VA email dated February 13, 2008, Dr. Katz wrote: "Shh! Our suicide prevention coordinators are identifying about 1,000 suicide attempts per month among the veterans we see in our medical facilities. Is this something we should (carefully) address ourselves in some sort of release before someone stumbles on it?" Ex. 1249.

## 2. VHA Budget

20. Paul Kearns, the VHA's Chief Financial Officer, testified that the VHA is not currently facing a budget crisis and has adequate money to "meet the mission requirements." PIRT 574:13–18. Dr. Cross agreed with this assessment and testified that the VA has sufficient funding to carry out its mission of ensuring that veterans have the medical care they need. *Id.* 225:12–23. Dr. Katz testified that the VHA's current budget provides enough funding to cover a "worst-case scenario" of an influx of veterans returning from Iraq and Afghanistan with mental illness. *Id.* 787:17–20.

21. In 2006, VHA spending on mental health care was approximately $2.4 billion. PIRT 555:17020. In 2007, this figure rose to $3.2 billion. *Id.* 557:8–10. In 2008, the VHA is on target to spend $3.5 billion on mental health care. *Id.* 558:2–3. The estimated budget for 2009 is $3.9 billion. RT 774:25–775:3.

22. Over the past few years, the VA has hired more than 3,800 new mental health staff. PIRT 739:12–13. There remain 500–600 unfilled mental health staff positions, out of a total of 16,500. *Id.* 419:12–22. In addition, for general health staff, the VA has approximately 1,400 unfilled physician positions out of 21,000 and 2,400 unfilled nursing positions out of 40,-000. *Id.* 224:2–7; 231:9–13.

23. Dr. Rosenheck, Director of VA's NEPEC, concluded that for every $100 increase in per capita outpatient mental health spending, there was an associated 6% decrease in the rate of suicide. Ex. 446 at 118.

### 3. Depression, PTSD, and Suicide

24. Dr. Ronald Maris, an expert witness for Plaintiffs in suicidology, testified that depression and PTSD are two of the leading risk factors for suicide. RT 270:3–10; 273:1–276:24. In general, Dr. Maris was highly critical of the manner in which the VA is treating suicidal or potentially suicidal veterans. *Id.*

25. Dr. Alan Berman testified as an expert witness for Defendants in suicidology. RT 1272:4–10. Dr. Berman agreed that depression is a leading risk factor for suicide and that PTSD is a "significant risk factor." *Id.* 1322:25–1323:6. Dr. Berman also agreed that it is important to treat PTSD on a timely basis, and that PTSD, if not properly treated, can lead to depression, and that depression and PTSD, if not properly treated, increase the risk of suicide. *Id.* 13237–20. Dr. Berman agreed that soldiers returning from Iraq have an elevated rate of suicide. *Id.* 1324:1–6. Dr. Berman testified that the quality of the VA suicide prevention program is "terrific." *Id.* 1294:7–10.

26. Dr. Blank testified that there is a strong connection between PTSD and suicide. RT 69:23–70:6. He also testified that depression is one outcome of untreated PTSD and that depression increases the risk of suicide. *Id.* 70:21–25; 71:1–7. Dr. Blank was critical of the VA's treatment methods for veterans with PTSD. *Id.* 83:14–22; 83:10–13.

### 4. Mental Health Strategic Plan

27. In July 2004, the VA developed and adopted the Mental Health Strategic Plan ("MHSP"). Ex. 398. The MHSP consists of 265 recommendations and was developed as a five year plan. RT 777:22–24; PIRT 477:24–478:1. It currently is in its fourth year of implementation. *Id.* Plaintiffs concede that the MHSP is a good plan. RT 705:14–706:7.

28. In fiscal year 2006, the VHA spent approximately $118 million out of a targeted $200 million on the MHSP. PIRT 553:1–4. In fiscal year 2007, the VHA spent approximately $325 million on the MHSP and for fiscal year 2008 the VHA is on target to increase this spending to $370 million. *Id.* 553:5–554:6.

29. One of the goals of the MHSP is to "[r]educe suicides among veterans." Ex. 398 at A–2. Among the initiatives intended to help reduce veteran suicides are ones to "[d]evelop a national systemic program for suicide prevention" and to "develop[ ] a plan to educate all staff that interact with veterans, including clerks and telephone operators, about responding to crisis situations involving at-risk veterans." *Id.* at A–2. Other key components of the MHSP are to develop "methods for tracking veterans with risk factors for suicide," and to "[r]equire annual screening for Mental Health and Substance Abuse Disorders." *Id.* at A–29. In addition, the MHSP called for mental health screening for "[e]very returning service man/woman . . . as part of the post-deployment and separation medical examination." *Id.* at A–5.

30. Dr. Katz testified that his office is responsible for "strategic planning about program development." PITR 737:4–5. He further testified that he was hired "specifically to oversee the implementation of the 2004, 2005 Mental Health Strategic Plan." *Id.* 738:5–6.

31. On May 10, 2007, the VA Office of Inspector General ("OIG") issued a report titled "Implementing VHA's Mental

Health Strategic Plan Initiatives for Suicide Prevention" ("May 2007 OIG Report"). Ex. 133. This report concluded that many components of the MHSP had not been implemented. *Id.* Initiatives such as screening veterans at risk, a suicide prevention database, emerging best practices for treatment, and education programs were all still at the "Pilot Stage" three years after the MHSP was implemented. *Id.* at 53.

32. The May 2007 OIG Report also found 61.8% of VA facilities had not implemented a suicide prevention strategy to target veterans returning from Iraq and Afghanistan. Ex. 133 at 37. In addition, 42.7% of VA facilities had not implemented a program to educate first-contact, nonmedical personnel about how to respond to crisis situations involving veterans at risk for suicide. *Id.* at 46. 70% of VA facilities had not implemented a tracking system for veterans with risk factors for suicide. *Id.* at 33. 16.4% of VA facilities had not implemented a system to facilitate referral of veterans with risk factors for suicide. *Id.* at 30.

### 5. Feeley Memo

33. William Feeley has been the Deputy Under Secretary for Health Operations and Management since February 10, 2006. Ex. 1259 at 1, Feeley Depo. Tr. Mr. Feeley, in his own words, is "responsible for the 21 [VISN] network directors in implementing policy and procedure that comes in, that gets developed at headquarters." *Id.* Mr. Feeley, as the number three person in the VHA, is tasked with ensuring that the VA Medical Centers and CBOCS comply with the "policies and the rules and regulations of the organization." *Id.* 2. He testified that when it comes to compliance in implementing procedures, the "[b]uck stops with me." *Id.*

34. On June 1, 2007, Mr. Feeley issued a memorandum to all VISN directors regarding "Mental Health Initiatives" ("the Feeley Memo"). Ex. 1259 at 4; Defs.' Ex. 513. The purpose of the Feeley Memo was to direct the VISN directors to begin implementing the specific initiatives of the mental health plan. Ex. 1259 at 8; Defs.' Ex. 513. According to Mr. Feeley, even though the MHSP was developed in 2004, he was unaware of whether the VHA had actually begun to implement the plan prior to June 2007. Ex. 1259 at 4. Furthermore, Mr. Feeley was unaware of whether the VISN directors were supposed to begin implementing the MHSP prior to his Memo. *Id.* Mr. Feeley conceded that he is unaware of "whether there's compliance with the tracking of veterans with risk factors for suicide," but agreed that such tracking, in addition to being part of the MHSP, was "a good suggestion." *Id.* at 7–8.

35. Part of the Feeley Memo states that veterans who present to a Medical Center or CBOC for the first time with mental health issues should be evaluated within 24 hours. Ex. 1259 at 11; Defs.' Ex. 513. Mr. Feeley conceded that he has no way of knowing whether any of the Medical Centers or CBOCS have implemented this initial 24 hour evaluation directive. Ex. 1259 at 12. Mr. Feeley testified that Drs. Zeiss and Katz were going to perform site visits to ensure compliance with this directive. *Id.* at 11.

36. Dr. Antoinette Zeiss is the Deputy Chief Consultant for the Office of Mental Health Services. PIRT 395:11–12. She has held this position since September of 2005 and she reports to Dr. Katz. *Id.* 395:13–16. Her section's responsibilities include "oversight for mental health programs in VA. That means working with those above [her section] on policies, working on consultation [with] the field about

appropriate implementation of programs, and particularly implementing the Mental Health Strategic Plan." *Id.* 3961–6. Since the Feeley Memo was issued in June 2007, Dr. Zeiss testified that as of March 5, 2008, only two site visits to ensure implementation had been conducted. *Id.* 457:19–25. The first of these visits occurred approximately three weeks prior to Dr. Zeiss's testimony. *Id.* 457:9–12. Other than these site visits, Dr. Zeiss has seen no reports that would otherwise indicate whether the Feeley Memo directives were being implemented system-wide. *Id.* 456:20–23.

37. The Feeley Memo also directs that a veteran who seeks an appointment for mental health issues be given a follow-up appointment within 14 days. RT 443:1–4; PIRT 481:12–17; Defs.' Ex. 513.

38. The VHA does not have the staff or resources to directly track whether the 24 hour evaluation policy outlined in the Feeley Memo is being implemented system-wide. RT 446:18–21.

39. Instead, in order to monitor compliance with the Feeley Memo directives, the VA uses two tangential metrics. RT 449:1–452:23. The first metric tracks the number of mental health providers hired at medical facilities within a VISN and the second tracks whether medical centers are complying with the requirement that a veteran who presents with mental health needs be given an appointment within 14 days. *Id.* 443:1–23; 446:6–25; 454:10–17.

#### 6. Delays in Mental Health Care

40. The May 2007 OIG Report found delays in obtaining referrals for depression and PTSD. Ex. 133 at 31. Where a primary care provider refers a patient with symptoms of moderate severity for depression, 40% of VA facilities reported same-day evaluation, 24.5% reported a wait time of 2–4 weeks and 4.5% reported a wait

time of 4–8 weeks. *Id.* The wait times for PTSD referrals were longer, with only 33.6% reporting same-day evaluation, 26% reporting 2–4 weeks, and 5.5% 4–8 weeks. *Id.* at 31–32. Nonetheless, the majority of veterans of Iraq and Afghanistan are being seen at clinics offering mental health services within 30 days. PIRT 594:11–595:16; Defs.' Ex. 514.

41. On September 10, 2007, the VA's OIG issued a report titled, "Audit of the Veterans Health Administration's Outpatient Waiting Times" ("September 2007 OIG Report"). Ex. 169. This report was prepared at the request of the U.S. Senate Committee on Veterans Affairs. *Id.* at i. The purpose of the report was to follow up on a July 2005 audit that found that the "VHA did not follow established procedures when scheduling medical appointments for veterans seeking outpatient care." *Id.* The July 2005 report made eight recommendations for corrective action, five of which the September 2007 OIG Report found had not been implemented. *Id.* at vi.

42. The September 2007 OIG Report found that "25 percent[ ] of the appointments we reviewed had waiting times over 30 days when we used the desired date of care that was established and documented by the medical providers in the medical records." Ex. 169 at ii. The report also found that "72 percent[ ] of the 600 appointments for established patients had unexplained differences between the desired date of care documented in medical records and the desired date of care the schedulers recorded...." *Id.* at iii. In addition, the report concluded that "[o]f the 100 pending consults, 79 (79 percent) were not acted on within the 7–day requirement and were not placed on the electronic waiting list. Of this number, 50 veterans had been waiting over 30 days

without action on the consult request." *Id.* at vi.

43. The September 2007 OIG Report found that schedulers were not adequately trained. Ex. 169 at vi. Of 113 schedulers interviewed, 47% had no training on consults within the last year, and 53% had no training on the electronic waiting list in the last year. *Id.* Furthermore, the report stated the following: "While waiting time inaccuracies and omissions from electronic waiting lists can be caused by a lack of training and data entry errors, we also found that schedulers at some facilities were interpreting the guidance from their managers to reduce waiting times as instruction to never put patients on the electronic waiting list. This seems to have resulted in some 'gaming' of the scheduling process." *Id.* The report concluded that "VHA's method of calculating the waiting times of new patients understates the actual waiting times," *id.* at 7, and that even though the "VHA has established detailed procedures for schedulers to use when creating outpatient appointments[, it] has not implemented effective mechanisms to ensure scheduling procedures are followed." *Id.* at 9.

44. As of April 2008, according to VHA's data, there are approximately 85,-450 veterans on VHA waiting lists for mental health services. Ex. 1244. As of February 1, 2008, there were 37,902 veterans having to wait more than 30 days for any type of medical appointment, not just one for mental health issues. Defs.' Ex. 528. According to the VA, as recently as February 2007, there were as many as 182,141 veterans waiting more than 30 days for a medical appointment. *Id.*

45. Dr. Jeffery Murawsky is the Chief Medical Officer for VISN Number 12, Great Lakes Region. PIRT 623:12–13. Dr. Murawsky testified that in his VISN, as of February 15, 2008, there were no Iraq or Afghanistan veterans on the wait list for a mental health appointment. *Id.* 635:7–9. Dr. Murawsky also testified that a veteran is not placed on the wait list until after he or she has had to wait 30 days. *Id.* 635:10–19.

46. In February 2005, the U.S. Government Accountability Office ("GAO"), prepared a report for the ranking Democratic Member of the House Committee on Veterans' Affairs. Ex. 37. The report was titled, "VA Should Expedite the Implementation of Recommendations Needed to Improve Post–Traumatic Stress Disorder Services." *Id.* Although the report began by noting that the VA "is a world leader in PTSD treatment and offers PTSD services to eligible veterans," *id.* at 1, it was also critical of the VA's lack of progress in implementing various recommendations, including some dating as far back as 1985. *Id.* at 5. For example, the report found that the VA had not developed referral mechanisms in all CBOCs that do not offer mental health services. *Id.* at 26, 27. The report summarized: "VA's delay in fully implementing the recommendations raises questions about VA's capacity to identify and treat veterans returning from military combat who may be at risk for developing PTSD, while maintaining PTSD services for veterans currently receiving them." *Id.* at 3.

47. Dr. Frances Murphy was the Deputy Under Secretary of Health Policy Coordination within the VA from October 2002 through April 2006. Ex. 1262 at 1. Dr. Murphy had helped draft the MHSP. *Id.* at 4. In the fall of 2005, Dr. Murphy informed then-Secretary Nicholson that there were "still significant gaps in delivery of substance abuse care, and that in certain areas of the country mental health access was still not meeting VHA standards." *Id.* at 4. In a speech on March 29, 2006, Dr. Murphy, while acknowledging

that the VA "has achieved benchmark performance in quality, patient satisfaction, patient safety and coordination of healthcare services," also noted that "[i]n some communities, VA clinics do not provide mental health or substance abuse care or waiting lists render that care virtually inaccessible." Ex. 397 at 6, 7. In February 2006 Dr. Murphy's office was eliminated. Ex. 1262 at 1, 2.

48. Every VA Medical Center now has a Suicide Prevention Coordinator. RT 1280:21–23. The Coordinators are charged with the task of overseeing the clinical care and tracking at-risk patients. *Id.* In preparation for their roles as Suicide Prevention Coordinators, the Coordinators, who are all mental health professionals, received only two and one half days of special training, which took place at the University of Rochester School of Medicine's center for the study of suicide. *Id.* 1290:6–11. As Defendants' expert Dr. Berman testified, the primary role of the Coordinators includes "identifying or making sure that suicidal patients are identified, in tracking, that they are getting the appropriate treatment, in educating and training the staff of the medical center, in promoting suicide awareness and education." *Id.* 290:18–23. As of May 2007, only 30% of the facilities polled had suicide tracking systems. Ex. 133 at 33.

49. The Suicide Prevention Coordinators are only at the 153 VA medical centers, and are not located at any of the roughly 800 CBOCs. RT 1318:10–1319:3. Most veterans receive their care at CBOCs. Ex. 357; RT 1318:15–17.

50. CBOCS only provide outpatient services during regular business hours, generally Monday through Friday from 8:00 a.m. until 4:30 or 5:00 p.m. PIRT 169:22–25.

51. In July 2007, the VA implemented a national Suicide Prevention Hotline.

PIRT 746:12–749:9. Between July 2007 and January 2008, the Hotline received 26,000 calls, of which 9,000 were confirmed to be from veterans and 900 from the families of veterans. *Id.* 778:1–9. In that same time period, the Suicide Prevention Hotline made approximately 2000 referrals of veterans seeking help to the Suicide Prevention Coordinators. *Id.* 745:7–14.

### 7. Medical Appeals Process

52. Veterans may appeal clinical medical decisions that affect eligibility determinations. For example, a veteran may appeal a clinical determination by a nurse or doctor but a veteran may not appeal the decision of an appointment scheduler. PIRT 713:2–714:13. If a veteran is told that the next available appointment is two weeks away but the veteran wants something sooner, the veteran cannot appeal this type of administrative scheduling decision. *Id.* 712:4–8. If, however, the veteran is told by a nurse or doctor that it is ok for him to wait those two weeks before his appointment—i.e., if a nurse or doctor makes a clinical decision regarding the veteran's need for access to health care—then the veteran may appeal this decision. *Id.*; *Id.* 656:25–657:25. The veteran appeals this decision by asking to speak with a "Patient Advocate." *Id.* 656:25.

53. The Patient Advocate Program is a system that VHA has in place to provide patients with an individual to help them with any issues or problems they might have with VHA. PIRT 638:16–19.

54. The Patient Advocate, after receiving a complaint from a veteran, is then supposed to log the veteran's complaint into the Patient Advocate database. PIRT 657:6–10. If the complaint deals with a clinical decision about the need for treatment, it will be referred up to the chief of staff, who then has seven days to make a

decision on how to handle the complaint. *Id.* 657:7–15.

55. If the veteran disagrees with the decision by the chief of staff, he or she can then appeal the decision to the VISN director at the network level, who would make the final decision. *Id.* 659:13–18. If the veteran disagrees with the VISN director's decision, the veteran can ask the VISN director to request an external review. *Id.* 661:14–663:4. Only the VISN director can request external review, and the veteran, on his or her own, has no way of independently securing it. *Id.* If the VISN director does request an external review, the veteran does not have the right to know the results of this review. *Id.* 719:5–10. If the VISN director refuses to share the results of the external review with the veteran, the only manner in which the veteran might obtain the results would be through a Freedom of Information Act request. *Id.* 719:10–17.

## 8. PTSD and Suicide Screening

56. When veterans first enroll in the VHA after separating from the service, they are given a mental health screen at their initial primary care visit. PIRT 518:5–21. They are screened for PTSD, depression, traumatic brain injury, military sexual trauma, and problem drinking. *Id.*

57. In addition, all veterans who present for evaluation of primary mental health and/or addiction disorders are screened for suicide risk. Ex. 365. This screening consists of the following two questions: (1) "During the past two weeks, have you felt down, depressed, or hopeless?" and (2) "During the past two weeks, have you had any thoughts that life was not worth living or any thoughts of harming yourself in any way?" *Id.* If the patient answers "yes" to the first question but "no" to the second, no further suicide risk assessment is called

for, unless the veteran is being admitted to an inpatient psychiatric unit. *Id.* Thus, unless the veteran admits to having suicidal thoughts within the last two weeks, no further suicide screening is performed, even if the veteran admits to having recently felt depressed or hopeless. *Id.*

58. Dr. Maris, Plaintiffs' suicidology expert, was highly critical of this screening mechanism and made a strong argument that it fell below the acceptable standard of care. RT 288:5–8. Dr. Maris stated that a more comprehensive screening procedure, which would take only an additional 10 or 15 minutes, would be far more accurate in screening suicidal veterans. *Id.* 288:12–289:23.

59. Defendants' suicide expert, Dr. Berman, testified that he "was singularly impressed" with what the VA is doing for screening and treating suicidal veterans. RT 1279:21–25. Dr. Berman testified that the two screening questions detailed above "are perfectly appropriate." *Id.* 1292:2. He further testified that the level of screening embodied by these two questions "is the standard of care with regard to screening for suicide prevention—suicidal patients." *Id.* 1292:10–11.

## B. *Veterans Benefits Administration*

60. The Veterans Benefits Administration ("VBA") administers benefit programs for veterans, including service-connected death and disability compensation ("SCDDC") benefits. RT 885:8–22. Under the Compensation and Pension Service, which includes nonservice-connected disabilities, approximately 3.4 million veterans receive benefits. *Id.* 887:12–14; 885:20–23. In fiscal year 2008, VBA will pay out approximately $38 billion in compensation and pension benefits. *Id.* 887:20.

61. Service connected injuries frequently interfere with the quality of life and/or preclude employment of a veteran upon return to civilian life, while deaths often deprive a veteran's dependents of their principal or sole means of support. Compl. ¶ 93; Answer, ¶ 93. Many benefits recipients are totally or primarily dependent upon SCDDC for support. *Id.*

62. After deployment to Iraq, soldiers aged 18–24 comprised 50% of the Army and 80% of the Marines. RT 357:9–19. 82% of the Army personnel deployed have a high school diploma or less. *Id.* 358:3–7. 89% of the Marines deployed have a high school diploma or less. *Id.* These figures indicate that many of these soldiers, once they separate and become veterans, may have difficulty navigating complex benefit application procedures unless they are provided with substantial assistance.

### 1. Adjudication Process for SCDDC Claims

63. Veterans may file a claim for compensation and pension benefits at any of the 57 VA Regional Offices ("ROs") throughout the country. RT 887:21–888:8.

64. A rating claim may seek compensation for more than one injury and each separate injury is considered an "issue" in the claim. RT 930:11–15.

65. In fiscal year 2007, the VBA received 838,141 ratings claims. Defs.' Ex. 542; RT 972:16–22. Of these, 225,173 were "original" claims, that is, first time requests for benefits by veterans. Ex. 543. The remaining 612,968 claims were "reopened" claims—claims from veterans who had previously sought benefits from the VA. Exs. 542, 543. Of the original claims that year, 58,532 had 8 or more issues and 166,641 had 7 or fewer issues. Ex. 543. Since fiscal year 2005, the number of claims with 8 or more issues has increased by 34%, while the number of

claims with 7 or fewer issues has remained mostly constant. *Id.*; RT 983:16–34–984:13.

66. Roughly 88% of veterans are granted SCDDC for at least one claimed disability. RT 1042:10–24.

67. Average Days to Complete ("ADC") measures the time required to adjudicate all rating claims over a finite period. RT 900:12–902:8. ADC is computed by taking all rating claims adjudicated during a period, adding the number of days it took to complete each one, and dividing by the total number of claims that were adjudicated. *Id.* 900:12–18. As of trial, the ADC for fiscal year 2008 was approximately 183 days. Defs.' Ex. 541; RT 936:11–12. Thus, on average, it takes the VBA 183 days to adjudicate a claim filed by a veteran. RT 936:11–15.

68. To establish a claim for SCDDC, a veteran must present evidence of (1) a disability; (2) service in the military that would entitle him or her to benefits; and (3) a nexus between the disability and the service. RT 887:8–11.

69. Veterans pursuing a SCDDC claim for PTSD have the additional burden of proving a "stressor" event during their service. RT 952:22–953:8. Evidence of a stressor is required by 38 C.F.R. § 3.304. A "stressor" is a specific event during the veteran's service that led to the development of PTSD. RT 953:2–8. This additional requirement makes SCDDC claims for PTSD unique from all other types of claims. *Id.* 952:24–953:1. As Ronald Aument, the Deputy Under Secretary for Benefits until January 3, 2008, testified, PTSD claims, because of the substantial subjectivity involved in their evaluation, are among the most complex claims that the VA is asked to adjudicate. Ex. 1257 at 5.

70. Section 3.304 also provides that "if the evidence establishes that the veteran engaged in combat ... and the claimed stressor is related to that combat, in the absence of clear and convincing evidence to the contrary, ... the veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor." 38 C.F.R. § 3.304(f)(1).

71. To file a SCDDC claim, a veteran must complete and submit a 23–page application on VA Form 21–526. RT 408:12–20; Ex. 1069. Veterans often make mistakes when completing this application and veterans suffering from PTSD have a particularly hard time with this. RT 39811–13.

72. Pursuant to the Veterans Claims Assistance Act ("VCAA"), 38 U.S.C. § 5103, the VA owes veterans the duty to assist them develop all evidence supporting the issues in a claim.

73. Upon receipt of a benefits claim application, a VBA employee known as a Veterans Service Representative ("VSR"), is required under the VCAA to notify the veteran regarding any further evidence the VBA requires to adjudicate the claim. 38 U.S.C. § 5103; RT 940:12–17. This notice, also known as a "duty to notify letter," must also indicate what information the veteran is expected to furnish and what evidence the VBA will seek on his behalf under the VCAA duty to assist. 38 U.S.C. § 5103; RT 940:12–17; 38 C.F.R. § 3.159(c).

74. Under the VCAA duty to assist, the VBA must seek all federal government records that may pertain to the claim. RT 940:23–941:4; 38 U.S.C. § 5103A. Typically, these will include service personnel and medical records, but may also include other records such as VA medical records or social security records. RT 942:6–944:8. The VA must continue to seek these records until the responsible agency attests that they are no longer available. *Id.* 940:23–941:4.

75. The duty to assist also requires the VBA to undertake reasonable efforts to acquire non-federal records, typically private medical records, identified by the veteran. RT 941:5–9; 944:9–945:2. The VBA cannot initiate the search for these records without a release executed by the veteran. *Id.*

76. The duty to notify letter provides veterans with a 60–day deadline to respond with any releases and with any evidence in the veteran's possession. RT 941:19–24. Once the releases are received, the VBA is required to request the private records from their respective custodians. *Id.* 944:22–945:4. The request asks the custodian to provide the records within 60 days. *Id.* 945:3–13. If the records custodian fails to do so, the VBA sends out another request seeking a reply within 30 days. *Id.*

77. The duty to assist also includes the duty of "providing a medical examination or obtaining a medical opinion when such an examination or opinion is necessary to make a decision on the claim." 38 U.S.C. § 5103A. This medical examination is known as a Compensation and Pension Examination ("C & P Exam"). RT 946:22–947:6. The purpose of the C & P Exam is to confirm that a disability exists and to assess the medical implications of that disability in order to assist the claim adjudicator in determining the percentage the veteran will be considered disabled pursuant to the rating schedule. *Id.* 946:25–947:13. Thus, some veterans who have been treated for a disability at a VA medical facility may nonetheless be required to undergo a C & P exam. For example, a veteran may have actually been diagnosed with and treated for PTSD at a VA medical center, but because of some shortcoming in the medical records or evi-

dence or because of some other deficiency, the veteran would still need to submit to a C & P exam if the VBA determines that one is necessary. Furthermore, a veteran may be diagnosed as not having, for example, PTSD, during a C & P Exam even after he or she was previously diagnosed as having PTSD by a treating physician at a VA medical center.

78. The VBA arranges and pays for a C & P exam. RT 951:18–952:20. The current wait time for a C & P exam is approximately 30–35 days. *Id.* 951:14–17.

79. Throughout the claims adjudication process, the evidentiary record remains open. RT 948:18–949:8. Thus, at any point, the veteran may supply new evidence. *Id.* The VACC duty to assist applies to this new evidence. *Id.* 945:3–13. In addition, the veteran may, at any time, introduce a new issue into the claim. *Id.* 949:9–950:1. For new issues, the claim development process is reinitiated so that the necessary evidence of this issue may be collected. *Id.* Between 10% and 20% of all claims have a new issue presented during the pendency of the claim. *Id.*

80. Once all the evidence has been gathered, a Rating Veterans Service Representative ("RVSR" or "rating specialist") decides whether the disability is service connected and, if it is, assigns a rating to the claim. RT 895:16–896:5; 956:19–957:9. The rating assigned to a claim is based on a sliding scale of monthly compensation ranging from $115 per month for a 10% rating to $2471 per month for a 100% rating. 38 U.S.C. § 1114. Approximately 88% of all ratings claims are at least partially granted. RT 1042:15–24.

81. Although a veteran may be represented throughout the claim adjudication process at the RO, the veteran is statutorily prohibited from compensating a lawyer to represent him at the RO level. 38 U.S.C. § 5904. Thus, veterans may be represented by attorneys acting pro bono or, more commonly, by Veteran Service Organizations ("VSOs"). RT 932:20–934:21. VSOs are organizations that work on behalf of veterans. *Id.* The VA in some cases provides VSOs with office space in the ROs, computer systems and access to VA databases. *Id.* VA, however, does not provide training to VSOs regarding how to assist veterans. *Id.* 934:4–13. In addition, all of the VSOs combined cannot meet the needs of all the veterans seeking benefits. *Id.* 514:19–515:1.

82. Veterans may appeal a rating decision by the RO by filing a Notice of Disagreement ("NOD"). RT 1008:9–24. The NOD must be filed within one year of the RO's decision. 38 U.S.C. § 7105(b)(1). The NOD is an informal paper stating that the veteran disagrees with some part of the rating decision and wishes to appeal. RT 1008:9–24. The veteran may appeal any part of any issue in the rating decision, including the denial of an issue, the percentage of disability assigned, or the effective date. *Id.*

83. As noted above, the record remains open throughout the appeals process, thus allowing the veteran to submit additional evidence at any time. RT 176:9–20. A veteran who disagrees with the RO decision can file an appeal with the Board of Veterans Appeals ("BVA"), which decides an appeal only after the claimant has been given an opportunity for a hearing. 38 U.S.C. § 7105(a). An adverse decision by the BVA may then be appealed to the CAVC, an Article I court established by Congress with the passage of the VJRA. The CAVC has exclusive jurisdiction to review decisions of the BVA. *See* 38 U.S.C. § 7252(a). Adverse decisions from the CAVC may then be appealed to the United States Court of Appeals for the Federal Circuit, *id.* § 7292(a), and then to the Supreme Court. *Id.* § 7292(c).

84. Upon receiving an NOD, the RO sends the veteran an election letter asking the veteran to choose between two nonexclusive appeals processes: a veteran may elect *de novo* review with a Decision Review Officer ("DRO") or the veteran may request the RO to issue a Statement of the Case ("SOC"), which provides a more detailed explanation of the rationale underlying the rating decision. RT 1009:2–1014:4; 38 U.S.C. § 7105(d)(1).

85. If the veteran elects *de novo* review with a DRO, the DRO, who is a senior rating specialist, will review the file and perform any additional development, including, if necessary, meeting with the veteran and any representative the veteran may have procured. RT 896:6–12; 1011:10–20. Because the DRO review occurs post-NOD, a veteran may retain paid counsel at this stage of the proceedings. 38 U.S.C. § 5904. DROs are empowered to reverse the initial rating decision if they determine that it was not warranted. RT 1012:4–6. If the DRO resolves some but not all of the appeal, an SOC will be prepared, and the traditional appellate path is followed. *Id.* 1010:3–14; 1012:12.

86. If the veteran elects to pursue the traditional appellate path, he or she must file a VA Form 9 within 60 days of receiving the SOC, or within a year of receiving the rating decision, whichever is longer. RT 1010:3–15; 1014:5–10; 38 U.S.C. § 7105(d)(3). Once the RO receives the veteran's Form 9 substantive appeal, the RO must then certify the appeal to the BVA. 38 C.F.R. § 19.35; RT 1017:2–12. There are no statutory or regulatory time limits imposed on the VA during any step of the adjudication and appeals process for SCDDC. RT 578:22–580:21. Veterans, conversely, are constrained by various time limits and failure to meet any of these deadlines can result in forfeiture of the appeal. *Id.* 1024:17–20.

## 2. VBA Inventory of Claims

87. The VBA's inventory of pending rating-related claims has increased from 337,742 claims as of January 1, 2005, to 400,450 claims as of April 12, 2008. Ex. 1322.

88. On average, it takes an RO 182 days from the date a claim is filed to issue an initial decision on that claim. RT 936:8–12. As of April 12, 2008, there were 101,019 rating-related claims pending more than 180 days. Ex. 1322. VBA's strategic goal is to process all claims in 125 days. RT 936:8–15. PTSD claims take longer to adjudicate than average SCDDC claims. *Id.* 120:24–121:2; 406:21–407:16; Ex. 1264 at 160:17–21.

## 3. Delays in Appeals Process

89. Of the more than 830,000 ratings claims filed each year, approximately 11% result in an NOD being filed by the veteran. RT 1006:12–24. Only 4% of the total number of claims filed each year actually proceed past the NOD to a decision by the BVA. *Id.*

90. On average, as of March 2008, it was taking 261 days for an RO to mail an SOC to a veteran after receiving an NOD. Ex. 1320 at VA322–00002598. It takes a veteran 43 days, on average, to file a Form 9 substantive appeal after receiving an SOC. Ex. 1310 at VA322–00002505–06; RT 215:7–216:20. It takes 573 days, on average, for an RO to certify an appeal to the BVA after receiving a Form 9 appeal from a veteran. Ex. 1310 at VA322–00002505–06; RT 215:7–217:2. Some veterans have had to wait more than 1,000 days for an RO to issue a certification of appeal to the BVA. Ex. 1260 at 6–7. In addition, some veterans have had to wait more than 1,000 days for an RO to even issue an SOC. *Id.* The Director of the Compensation and Pension Service within the VA, Bradley

Mayes, testified at a deposition that VBA has not "made a concerted effort to figure out what's causing" these delays. *Id.* at 7.

91. The Deputy Undersecretary for Benefits for the VA, Michael Walcoff, testified that the significant delays by the ROs in issuing SOCs and certifications of appeal are attributable, in part, to the priority VA has focused on adjudicating initial claims. RT 1019:1–1020:5; 1129:20–1130:10; 1171:25–1172:18; Ex. 1258 at 12.

92. On average, it takes the BVA 336 days to issue a decision on an original appeal, as opposed to a remand, after a claim is certified to the BVA by an RO. Ex. 1310 at VA322–00002505–06.

93. Although veterans have a right to submit new evidence at any time during the appeals process, this alone does not account for the extensive delays. RT 207:25–208:3; 249:9–250:12; 364:9–23; 1019:15–20; 1129:15–1130:10; 1171:25–1172:18. When a veteran submits new evidence, the VBA issues a supplemental statement of the case ("SSOC"). *Id.* 208:4–19. Form 9 substantive appeals without an SSOC have been pending, on average, for 320 days. *Id.* 237:4–239:16; Ex. 1320 at VA 322–00002598, 2600.

94. As part of the appeal process to the BVA, veterans have the right to a hearing before a BVA judge. 38 C.F.R. § 20.700; RT 528:23–25. At the veteran's option, the hearing may be held at the expense of the veteran in Washington D.C., or by video-conference, or at the closest RO in what is called a Travel Board hearing. 38 C.F.R. § 20.700; RT 529:1–4; 1017:16–1018:2. The Travel Board hearings typically happen only once or twice a year at each RO. RT 1018:3–16. If a veteran requests a hearing, he or she will have to wait, on average, 455 days. Ex. 1324 at VA322–00002653–54; RT 231:12–18; 581:24–582:2. Veterans who receive hearings are more

likely to prevail on their appeal. Ex. 1243 at 5.

95. For veterans who pursue an appeal to completion, it takes, on average, 1,419 days to receive a BVA decision after filing an NOD. Ex. 1323 at VA322–00002552; RT 221:22–222:7. It takes approximately 4.4 years—182 days for an initial RO decision plus 1,419 days for a BVA decision—for a veteran to adjudicate a claim all the way to a BVA decision. RT 259:22–261:21. This 4.4 years excludes the time between an RO's initial decision and a veteran's NOD filing, which may be as long as one year. *Id.* 261:3–6.

96. The metric "Appeals Resolution Time" measures the average number of days, nationwide, that it takes to resolve appeals from the date an NOD is filed. RT 568:20–24. This metric, unlike the one described in the preceding paragraph, includes claims that are resolved before the BVA issues an opinion. *Id.* 568:20–569:3. If a veteran dies before the BVA adjudicates his appeal, the appeal is considered resolved. *Id.* 1174:2–10.

97. The Appeals Resolution Time increased from 599 days in April 2005, to 671 days by the end of February 2008. RT 563:14–16; 567:17–19. During this same time period, VBA's internal goal for Appeals Resolution Time increased from 500 to 700 days. *Id.* 563:14–18; 567:13–16. The Appeals Resolution Time is expected to increase by another 100 days in fiscal year 2008. Ex. 1264 at 15–16.

98. If one excludes from the Appeals Resolution Time those claims that are resolved, for whatever reason, before the BVA issues a decision, the Appeals Resolution Time jumps to 1,419 days, or almost four and a half years. RT 573:21–574:3. At trial, James Terry, the Chairman of the BVA, was unable to explain this lengthy delay in the resolution of appeals. *Id.* 575:21–576:9.

99. The composition of the BVA is determined, in part, by statute. 38 U.S.C. § 7101. Section 7101 states that "[t]he Board shall consist of a Chairman, a Vice Chairman, and such number of members as may be found necessary in order to conduct hearings and dispose of appeals properly before the Board in a timely manner." *Id.* The statute further states that "[t]he board shall have sufficient personnel . . . to enable the Board to conduct hearings and consider and dispose of appeals properly before the Board in a timely manner." *Id.*

100. In addition to the chairman and vice-chairman, the BVA is currently comprised of 60 judges and their respective staffs. RT 557:19–558:5. The number of judges employed by the BVA is within the discretion of the VA Secretary. *Id.* The BVA issued 40,401 decisions in fiscal year 2007. Ex. 370 at 2. 95% of these decisions dealt with SCDDC claims. *Id.* The BVA received 39,817 appeals in fiscal year 2007 and expects to receive 43,000 appeals in fiscal year 2008. *Id.*

101. On average, the BVA affirms an RO's disposition of a veteran's claim only 40% of the time. RT 1007:10–11. The BVA, on average, grants a veteran's appeal roughly 20% of the time, and the veteran's appeal is remanded by the BVA to the VBA in the remaining 40% of the cases. *Id.* 1007:2–25.

102. Of the cases certified for appeal by the ROs, between 19% and 44% were "avoidable remands." RT 559:9–560:13; 1027:9–16; Ex. 1312. An avoidable remand is defined as an appeal in which an error is made by the RO before it certifies the appeal to the BVA. *Id.* 1026:21–1027:4. Almost half of the avoidable remands that occurred between January 1, 2008, and March 31, 2008, were the result of the VBA employees violating their duty to assist veterans. *Id.* 556:2–24; 1166:14–20.

103. A survey of VBA rating specialists at ROs found that 70% of them believed that speed in assigning ratings to claims was emphasized over accuracy. RT 161:23–163:3.

104. When the BVA remands a claim, the claim is sent either to the Appeals Management Center ("AMC"), or returned to an RO. RT 210:10–14. Once an SCDDC claim is remanded by the BVA, it takes on average 499.1 days for this claim to be granted, withdrawn, or returned to the BVA for a second time. Ex. 1243 at 13. It takes, on average, 563.9 days for PTSD claims to be granted, withdrawn, or returned to the BVA. *Id.*

105. Approximately 75% of the claims that are remanded by the BVA are subsequently appealed to the BVA a second time. RT 544:15–24. It then takes the BVA an average of 149 days to render a second decision on a claim that had already been remanded once and subsequently re-appealed to the BVA. Ex. 1310 at VA322–00002505–06; RT 215:7–217:19. The BVA Chairman Terry testified that "the entire system is hurt by remands." RT 543:20–25.

106. Between October 1, 2007, and March 31, 2008, alone, at least 1,467 veterans die d during the pendency of their appeals. Ex. 1316 at VA322–00002613–24; RT 254:6–255:2. When an appellant die s, the appeal is extinguished. RT 1173:24–1174:1.

107. It is beyond doubt that disability benefits are critical to many veterans and any delay in receiving these benefits can result in substantial and severe adverse consequences, including the inability to make mortgage or car payments. RT 517:25–518:9; PIRT 324:13–325:5. Although a benefit award is generally retroactive to the date of the claim, the veteran is not entitled to interest. RT 551:7–14.

#### 4. VA Efforts for Reducing Delay

108. In Spring of 2007, Congress authorized VBA to hire an additional 3,100 employees and provided the necessary additional appropriations. RT 918:4–21; 999:1–19. 2,700 of these new employees will be hired into the Compensation and Pension line of business. *Id.* At the time of trial, 2,100 of the 2,700 employees had already been hired. *Id.* Prior to this round of hiring, the VBA had a total of 8,000 employees. *Id.*

109. On April 16, 2008, the VBA proposed a new pilot program, in the form of a regulation, for expedited claims adjudication. Defs.' Ex. 557; 38 C.F.R. Parts 3 and 20. The two-year program would be limited to four ROs. Defs.' Ex. 557; 38 C.F.R. Parts 3 and 20. The program would ask veterans to sign a waiver upon filing a claim whereby several time limits imposed on the veteran would be shortened. Defs.' Ex. 557; 38 C.F.R. Parts 3 and 20; RT 1169:9–19. In addition, the program imposes a time limit, albeit one that is unenforceable, on the VBA during the appellate process between a veteran's Form 9 filing and an RO's certification of appeal to the BVA. RT 1167:10–1168:22. There are no consequences for the BVA if it exceeds its recommended time limit. *Id.* 1024:11–16; 1168:10–14.

110. According to Deputy Under Secretary for Benefits Walcoff's trial testimony, the VBA is also pursuing two other efforts at reducing delays in the appellate process at ROs. RT 1020:6–1021:9. The first is to establish Appeals Resource Centers dedicated solely to appellate work. *Id.* Mr. Walcoff conceded, however, that these centers are not yet in place and he has not seen a plan to create them. *Id.* 1162:7–8; 1167:6–8. The second effort at reducing delays involves emphasizing appellate performance measures in evaluations. *Id.* 1020:6–1021:9.

#### 5. Extraordinary Awards Procedure

111. The Compensation & Pension Service ("C & P") is an organization within the VA's central office in Washington, D.C. RT 903:13–904:24. C & P is responsible for setting the policies governing adjudication of SCDDC claims. *Id.* C & P is not empowered to decide claims. Ex. 1260 at 12.

112. C & P conveys policies and procedures to ROs by publishing manuals. RT 905:22–25. C & P issues "Fast Letters" to RO directors when there are changes to a procedure within a manual. *Id.* 913:4–25. ROs are expected to abide by the terms of a Fast Letter. *Id.* 913:7–15. In Fast Letter 07–19, dated August 27, 2007, C & P outlined an "extraordinary awards" procedure for ROs to follow when dealing with claims that would result in a retroactive payment of at least eight years or a payment of more than $250,000. Ex. 375–A at 1–2; RT 1043:2–12. This procedure is not specified in any statute or regulation. Ex. 1260 at 11–12. The procedure directs ROs to send the claims folder for all cases meeting the criteria to C & P for a concurring opinion before the benefit award is given to the veteran. Ex. 375–A at 1–2; RT 1043:2–12. Pursuant to this Fast Letter, C & P only reviews claims where the veteran was awarded retroactive benefit payments for eight years or a payment of more than $250,000. RT 1044:18–20. C & P does not review denials of such claims. *Id.* Veterans are not notified that their claims are reviewed pursuant to this procedure. *Id.* 1045:17–23.

113. C & P has reviewed approximately 800 rating decisions, most of which were reviewed because they called for benefits to be retroactively awarded for eight or more years. RT 1043:20–24. Less than 25 of the 800 rating decisions were reviewed by C & P because the proposed

award was greater than $250,000. *Id.* The vast majority of those reviews resulted in a reduction of the proposed benefits. Ex. 1264 at 18.

## V. *CONCLUSIONS OF LAW*

With the background of the foregoing findings, the Court turns to the conclusions of law and, in particular, addresses the relief sought by Plaintiffs.

### A. *Standing*

1. Plaintiffs have demonstrated that their members have suffered injuries in fact. *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. As testified to at trial, their members have faced significant delays in receiving disability benefits and medical care from the VA. Furthermore, given the dire consequences many of these veterans face without timely receipt of benefits or prompt treatment for medical conditions, especially depression and PTSD, these injuries are anything but conjectural or hypothetical.

2. Plaintiffs have also demonstrated a causal connection between the injury and the conduct at issue. *Id.* As Defendants concede, delays in health care, especially for mental health issues, and delays in receipt of disability benefits, which are often the primary or sole source of income for a veteran, can lead to exactly the type of injuries complained of by Plaintiffs.

3. Finally, the relief sought by Plaintiffs would likely result in the amelioration of the injuries. *Id.* Defendants argue that any relief afforded by the Court would be too speculative to redress Plaintiffs' injuries. If, however, the Court were to order, for example, that the VBA adjudicate a veteran's appeal of a denial of benefits within a certain time period, Plaintiffs' injuries would be redressed.

The issue, as discussed below, is whether this and the other relief sought by Plaintiffs are within the power of the Court to grant. Nonetheless, for the purpose of standing, the Court finds that Plaintiffs' individual members would have standing to sue.

4. It is clear, and Defendants do not argue otherwise, that the interests at stake are germane to the purposes of both organizations. *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693. Both organizations are comprised primarily of veterans and both organizations are working to decrease the wait times for, and improve the quality of, mental health care and delivery of disability benefits.

5. The participation of Plaintiffs' individual members was not required at any point throughout the duration of the trial. *Id.* For all of these reasons, the Court concludes that Plaintiffs, as organizations, have standing to bring suit on behalf of their members.

### B. *Waiver of Sovereign Immunity*

6. To fall within the APA's waiver of sovereign immunity under 5 U.S.C. § 702, Plaintiffs must establish that they challenge final agency action for which there is no alternate adequate remedy. *Nat'l Wildlife Fed'n,* 497 U.S. at 882, 110 S.Ct. 3177; 5 U.S.C. §§ 702, 704. In determining whether Plaintiffs have challenged final agency action, the Court examines each of Plaintiffs specific challenges below. In assessing whether there exists an adequate alternate forum, the Court notes that in the Motion to Dismiss Order, the Court held that the system established by Congress for adjudicating veterans' individual benefit claims does not provide an adequate alternative remedy for the limited purpose of Plaintiffs' systemic, facial constitutional challenges. However, as discussed in detail below, even though

there may not be adequate alternative remedy, Plaintiffs' challenges under the APA fail for other reasons, including failure to challenge a final agency action, failure to challenge a discrete agency action, and/or failure to challenge an action that the agency is required to take. *See Nat'l Wildlife Fed'n*, 497 U.S. at 882, 110 S.Ct. 3177; *Norton*, 542 U.S. at 64, 124 S.Ct. 2373. Nonetheless, in the interest of uniformity, the Court briefly revisits its discussion on adequate alternative remedy.

 7. The Veterans' Judicial Review Act ("VJRA"), Pub.L. No. 100–687, 102 Stat. 4105 (1988), permits veterans to challenge VA decisions on individual benefits decisions in the CAVC. 38 U.S.C. § 7261. Pursuant to statute, the CAVC, an Article I appellate court, only has jurisdiction to affirm, reverse, or remand decisions of the BVA on individual claims for benefits. 38 U.S.C. § 7252(a). The CAVC's jurisdiction is therefore limited to the issues raised by each veteran based on the facts in his or her claim file from his or her particular case. *See, e.g., Cleary v. Brown*, 8 Vet.App. 305, 307 (1995) (stating "[i]n order to obtain review by the Court of Veterans Appeals of a final decision of the Board of Veterans' Appeals ["BVA"], a *person* adversely affected by that *action* must file a notice of appeal with the Court") (emphasis added). Accordingly, the CAVC would not have jurisdiction over or the power to provide a remedy for the systemic challenges to the VA health system such as those brought by Plaintiffs.

8. The CAVC itself has recognized its limited remedial power, stating: "[I]t must be borne in mind that the jurisdiction of this Court is over final decisions of the BVA.... Nowhere has Congress given this Court either the authority or the responsibility to supervise or oversee the ongoing adjudication process which results in a BVA decision." *Cleary*, 8 Vet.App. at

308. Although the facts in *Cleary* are clearly distinguishable from those before this Court, many of Plaintiffs' challenges are aimed directly at the processes that the regional offices and the BVA use to reach decisions of individual claims. These processes, as conceded by the CAVC itself, are outside the purview of its jurisdiction.

9. In *Dacoron v. Brown*, 4 Vet.App. 115 (1993), the CAVC, then named the Court of Veterans Appeals ("CVA"), again recognized the limitation of its own remedial power. The court noted that constitutional challenges will be "presented to this Court only in the context of a proper and timely appeal taken from such decision made by the VA Secretary through the BVA." *Id.* at 119. Plaintiffs in the present case, for the reasons stated below, would be unable to bring a claim before a VA regional office, much less appeal such a claim to the BVA or CAVC. Regarding its ability to address constitutional issues through the All Writs Act, the court stated:

> Although this Court also has authority to reach constitutional issues in considering petitions for extraordinary writs under 28 U.S.C. § 1651(a), the Court may, as noted above, exercise such authority only when a claimant has demonstrated that he or she has no adequate alternative means of obtaining the relief sought and is clearly and indisputably entitled to such relief. *See Erspamer [v. Derwinski*, 1 Vet.App. 3, 7 (1990) ]. Where, as here, a claimant remains free to challenge the constitutionality of a statute in the U.S. district court, she has not demonstrated that she lacks adequate alternative means of obtaining the relief sought.

*Id.* Thus, the very courts that were established by the VJRA recognize not only the jurisdiction of district courts for constitu-

tional claims but, more importantly for this issue, recognize the limited jurisdiction that they themselves possess.

10. Plaintiffs, as organizations seeking to protect the interests of a broad class of veterans, would be unable to bring suit in the VA system. Organizations do not and cannot submit individual claims for benefits to the regional offices and, therefore, are precluded from ever presenting claims on appeal to the BVA, the CAVC, or the Federal Circuit. Under the position advocated by Defendants, Plaintiffs would be barred from raising these particular claims in any forum. Plaintiffs' members would be left to litigate their own individual claims while also attempting to shoehorn into their claims the challenges now asserted. The statutory framework of the VA benefits system does not provide for this and, as such, the VA benefits system is not an adequate alternate forum for Plaintiffs' systemic and facial constitutional challenges.

### C. *Plaintiffs' Proposed Remedies*

11. One issue that has generated some difficulty throughout this litigation has been determining exactly which practices and actions of the VA Plaintiffs challenge. For example, in their Complaint, Plaintiffs allege that "certain widespread practices and policies of the VA" are illegal. Compl. ¶ 31. Among these, Plaintiffs list protracted delays in adjudication and treatment of PTSD, premature denial of PTSD claims, and "[v]arious other illegal practices and procedures as outlined" in other parts of the 68 page Complaint. *Id.* ¶ 31a-e.

To ensure that the Court addresses the specific relief sought by Plaintiffs, the Court will use Plaintiffs' Proposed Conclusions of Law as well as the Proposed Order submitted with Plaintiffs' Post–Trial Briefing as a template to address Plaintiffs' claims and remedies.

### 1. Mental Health Care

12. Section 1710 states, in part, that the Secretary "shall furnish hospital care and medical services which the Secretary determines to be needed to any veteran for a service-connected disability...." 38 U.S.C. § 1710(a)(1). It further states, *inter alia*:

[A] veteran who served on active duty in

a theater of combat operations ... after November 11, 1998, is eligible for hospital care, medical services and nursing home care ... notwithstanding that there is insufficient medical evidence to conclude that such condition is attributable to such service.

38 U.S.C. § 1710(e)(1)(D). Section 1710(e)(3)(C)(i) provides a five-year period for this medical care. For reasons discussed at length in the Motion to Dismiss Order, the Court found that this language created an entitlement to health care for veterans for five years after separation from active duty. *See* Mot. to Dismiss Order at 35–38. The Court need not repeat this discussion, as even with this finding, the remedies proposed by Plaintiffs are beyond the power of this Court.

13. Plaintiffs, in their Proposed Order, state the following:

Defendants' failure to provide timely and effective health care to veterans with PTSD, and related or co-occurring conditions such as depression or traumatic brain injury, and/or veterans exhibiting suicidal intentions or symptoms, constitutes a statutory violation of 38 U.S.C. §§ 1705 and 1710, and that failure constitutes agency action unreasonably delayed under 5 U.S.C. § 706(1).

Proposed Order ¶ 5.

14. Although the provision of care is mandatory, it is beyond the power of this

Court to determine when and how such care shall be provided. Were it to do so, the Court would have to substitute its own definitions of both "timely" and "effective," something prohibited by both the APA and by §§ 1705 and 1710 themselves.

### a. Timely and Effective Mental Health Care

15. Section 706(1) of the APA permits federal courts to order agencies to act only where the agency fails to "take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64, 124 S.Ct. 2373 (emphasis in original). "Thus, when an agency is compelled by law to act ..., but the manner of its action is left to the agency's discretion, a court ... has no power to specify what the action must be." *Id.* at 65, 124 S.Ct. 2373. Furthermore, "[g]eneral deficiencies in compliance ... lack the specificity requisite for agency action." *Id.* at 66, 124 S.Ct. 2373.

16. As became obvious from the parties' own mental health experts, what constitutes "timely" and "effective" health care is an issue that lacks consensus even among those who are experts in the mental health field. Thus, for example, at trial there was strong disagreement as to what constitutes appropriate or adequate care for diagnosis and treatment of veterans with PTSD, depression, and/or suicidal ideation. *See, e.g.*, Findings of Fact ¶¶ 58, 59, *supra*. These disagreements alone, even if the Court had the power to step in, would make it exceedingly difficult to fashion a plan and order the VA to implement a prescribed course of mental health care.

17. The Court is prohibited from even reaching that issue, however, as "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with ... congressional directives is not contemplated by the APA." *Norton*, 542 U.S. at 66, 124 S.Ct.

2373. For these reasons, Plaintiffs' claim that the VA is not providing timely or effective mental health care is plainly precluded by the APA. Any order by this Court relating to the sufficiency and timeliness of mental health care would effectively draw this Court into the position of overseeing various aspects of the VA, something the Supreme Court has expressly prohibited. The Supreme Court has stated:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would necessarily mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into the day-to-day agency management.

*Norton*, 542 U.S. at 67, 124 S.Ct. 2373.

18. Finally, Plaintiffs' claim that the VA is failing to provide any mental health care is not supported by the evidence presented at trial. Even had Plaintiffs' made this showing, however, the APA would likely have prevented review in this Court, as the APA does not allow "plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action dressed up as an agency's failure to act." *Ecology Ctr.*, 192 F.3d at 926 (internal quotation marks omitted).

19. In addition, § 1710 commits decisions about the provision of medical care to the Secretary's discretion. 38 U.S.C. § 1710. As noted above, the Court would have no manner in which to determine what type of mental health care is required. *See Webster v. Doe*, 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (stating "under § 701(a)(2) [of the APA],

even when Congress has not affirmatively precluded judicial oversight, review is not to be had if the statute is drawn so a court would have no meaningful standard against which to judge the agency's exercise in discretion") (internal quotation marks omitted). Section 1705 also dictates that the Secretary "ensure that the system will be managed in a manner to ensure that the provision of care to enrollees is timely and acceptable in quality." 38 U.S.C. § 1705. As such, the design and implementation of a health care enrollment system is delegated to the Secretary of the VA, leaving courts with no meaningful standards against which to judge the agency's exercise in discretion. Plaintiffs' challenge to the timeliness and effectiveness of the VA's delivery of mental health care is thus also barred by §§ 1705 and 1710.

**b. Delay in Mental Health Care and Due Process**

20. The *TRAC* factors provide the framework for a court to determine whether agency action has been unreasonably delayed. *See* Section III.D.1., *supra.* Before the Court can even reach the *TRAC* factors and the issue of unreasonable delays in the provision of mental health care, however, there must be a showing that there are in fact system-wide delays in providing this care. The evidence presented at trial falls short of this. For example, the Court received evidence that the majority of veterans of Iraq and Afghanistan are being seen at clinics offering mental health services within 30 days. Findings of Fact ¶ 40. Although the evidence clearly did not prove that every veteran always gets immediate mental health care, it by no means follows that there is a system-wide crisis in which

health care is not being provided within a reasonable time.[4]

**c. Clinical Appeals Process**

21. Plaintiffs, in their Proposed Order, assert the following:

> [T]he VA's process for resolving clinical disputes about health care treatment violates the Due Process Clause in that it does not apply to refusals to provide care....

Proposed Order ¶ 6. As noted in the Findings of Fact, a veteran may appeal a clinical medical decision, but if, for example, a veteran is told to return at a later date solely on the basis that there are no available appointments, he or she has no way of appealing this decision. If, however, a veteran is told to come back later because a VA employee has indicated that the veteran's health will not be adversely affected by coming at a later time, then the veteran can appeal this clinical diagnosis.

22. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. In evaluating whether a procedure satisfies Due Process, courts balance (1) the private interest, (2) the risk of erroneous deprivation and the likely value, if any, of extra safeguards, and (3) the government's interest, especially the burden any additional safeguards would impose. *Id.* at 332, 96 S.Ct. 893.

23. Without question, the private interest of veterans in receiving health care is high. The risk of erroneous deprivation, however, is less so. The Court heard testimony during the trial that veterans who present at a VA medical facility with emergency mental health issues are seen immediately. This is not to say that

---

4. Plaintiffs, perhaps realizing this, did not include in their Proposed Order any language relating to Due Process violations and delays in mental health care. *See* Proposed Order ¶¶ 4–6.

every time a veteran presents with a mental health emergency, he or she is guaranteed immediate treatment. Nonetheless, Plaintiffs did not prove a systemic denial or unreasonable delay in mental health care. In addition, a veteran who is told to come back at a later time because his or her health is such that immediate treatment is not required may appeal this clinical decision. Finally, additional safeguards at this level would impose burdens on the VA. *See Parham v. J.R.*, 442 U.S. 584, 605, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (stating that the government "has a genuine interest in allocating priority to the diagnosis and treatment of patients . . . rather than to time-consuming procedural minuets").

24. Plaintiffs' Proposed Order also states that the clinical appeals process violates Due Process because "there is no opportunity for any hearing by a neutral decision-maker, the process is unduly complicated and lengthy, and there is no provision for any expedited process that would apply in an emergency situation such as a threatened suicide." Proposed Order ¶ 6. "Procedural due process requires adequate notice and an opportunity to be heard." *Kirk*, 927 F.2d at 1107.

25. The process for clinical appeals involves consultation with the treating physician, access to patient advocates, and the opportunity to appeal a medical decision to both the facility and VISN level. Findings of Fact ¶ 52. Moreover, due process does not "always require an adversarial hearing," nor does it require an "independent decision maker come from outside the hospital administration." *Hickey*, 722 F.2d at 549. The process afforded veterans seeking to appeal their medical decisions strikes the Court as an appropriate balance between safeguarding the veteran's interest in medical treatment and permitting medical treatment without overly bur-

densome procedural protections. In addition, the Court is mindful of the Supreme Court's admonition that "[t]he mode and procedure of medical diagnostic procedures is not the business of judges." *Parham*, 442 U.S. at 607–08, 99 S.Ct. 2493. For these reasons, the Court cannot conclude that the VA clinical appeals process violates Due Process.

### 2. Mental Health Strategic Plan

26. Plaintiffs ask the Court to order the VA, within 150 days, to fully implement the MHSP. Proposed Order ¶ 12. Plaintiffs concede that the MHSP is a good plan. Thus, rather than attacking the MHSP itself, Plaintiffs instead attack the VA's slow progress and/or failure in implementing the MHSP.

27. Such an attack relies on § 706 of the APA, which provides that a "reviewing court shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(a). "Review of an agency's failure to act has been referred to as an exception to the final agency action requirement." *Ctr. for Biological Diversity*, 218 F.Supp.2d at 1157. "Courts have permitted jurisdiction under the limited exception to the finality doctrine only when there has been a genuine failure to act." *Ecology Ctr.*, 192 F.3d at 926. The Ninth Circuit "has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action dressed up as an agency's failure to act." *Id.* (internal quotation marks omitted). Plaintiffs' challenge to the manner and speed with which the MHSP has been implemented is foreclosed by this caselaw.

28. Furthermore, waiver of sovereign immunity under § 706 of the APA requires a challenge to "a discrete agency action that [the agency] is required to take." *Norton*, 542 U.S. at 64, 124 S.Ct. 2373. The MHSP falls outside of this

definition. The MHSP consists of 265 recommendations. Findings of Fact ¶ 27. Whether a plan with this many recommendations can be characterized as "discrete agency action" is dubious. More problematic, however, is the fact that the actions and strategies outlined in the MHSP are recommendations, and, accordingly, are not actions the VA "is required to take."

29. Finally, as Plaintiffs concede, the MHSP was developed as a five year plan and is currently only in the fourth year of implementation. It would be anomalous for the Court to find that the MHSP were a final agency action or that the VA has failed or delayed to implement the MHSP, when the action is ongoing and is not even expected to conclude until late next year. For these reasons, Plaintiffs' request that the Court order the VA to implement the MHSP within 150 days is barred by sovereign immunity.

### 3. Feeley Memorandum

30. Plaintiffs' request that the Court order the VA to fully implement the Feeley Memo within 150 days is equally problematic under the APA's requirements for waiver of sovereign immunity. Although the Feeley Memo, and its call for 24–hour mental health triage and 14–day follow-up mental health care is much more akin to a discrete agency action than the MHSP, it nonetheless is not an action that the VA is required to take. Instead, the Feeley Memo contains "initiatives" created by the Secretary that were designed to "enhance the capacity of mental health services, and facilitate access to high quality services." Findings of Fact ¶ 34. "The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." *Norton*, 542 U.S. at 65, 124 S.Ct. 2373. Moreover, "[g]eneral deficiencies in compliance, unlike [a] failure to issue a ruling

. . ., lack the specificity requisite for agency action." *Id.* at 66, 124 S.Ct. 2373. For these reasons, Plaintiffs' request that the Court order the VA to fully implement and monitor the Feeley Memo initiatives is barred by sovereign immunity.

### 4. Delays in Adjudication of SCDDC Benefits

31. Plaintiffs assert that the delays in adjudicating SCDDC benefit claims are excessive and unreasonable and therefore violate the rights of veterans under the APA and the Due Process Clause.

32. It takes the VBA, on average, 183 days to adjudicate a claim filed by a veteran. Findings of Fact ¶ 67. Of the more than 830,000 ratings claims filed each year, approximately 11% result in an NOD being filed by the veteran. *Id.* ¶ 89. Only 4% of the total number of claims filed each year actually proceed past the NOD to a decision by the BVA. *Id.* For veterans who pursue an appeal to completion, it takes, on average, 1,419 days to receive a BVA decision after filing an NOD. *Id.* ¶ 95. Although these delays in benefits claims adjudications, especially for appeals, are substantial, the existing statutory framework and caselaw prevent this Court from taking remedial action. This conclusion is reinforced by the fact that only 4% of the total claims each year are appealed and pursued to a decision by the BVA.

33. As noted above, 38 U.S.C. § 511 prevents the Court from reviewing delays in individual veterans' cases. The issue, however, of whether a veteran's benefit claim adjudication has been substantially delayed will often hinge on specific facts of that veteran's claim. For example, a veteran who raises seven or eight issues in his or her claim will likely face a more protracted delay than a veteran who raises only one or two issues. Thus, although the determination of whether the delay is un-

reasonable may depend on the facts of each particular claim, *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir.1986), § 511 prevents this Court from undertaking such a review.

34. Furthermore, were the Court to implement the injunctive relief requested by Plaintiffs and order that the VA shorten the average wait times, such an order would invariably implicate VA regulations. For example, 38 C.F.R. § 3.159(b)(1) requires the VA to notify claimants once the VA has received most or all of a claim application; 38 C.F.R. § 3.159(c) requires the VA to assist the veteran in obtaining medical records; 38 C.F.R. § 3.103(c) provides the time limit for filing a Notice of Disagreement; 38 C.F.R. § 3.109(a) provides that a veteran's claim is treated as abandoned if evidence is not submitted within one year; and 38 C.F.R. §§ 20.200–20.202 set forth the procedural requirements to pursue an appeal. 38 U.S.C. § 502 permits litigation of challenges to VA regulations only in the Federal Circuit. *See Preminger*, 422 F.3d at 821 (stating "Congress has explicitly provided for judicial review of direct challenges to VA rules and regulations only in the Federal Circuit"). Plaintiffs argue that even though various regulations are implicated in the relief they seek, § 502 does not strip the jurisdiction of this Court because Plaintiffs do not directly challenge the regulations. An order expediting claims adjudications, however, would force the VA to alter or repeal some of these regulations. Although the Court does not suggest that VA regulations alone are responsible for the substantial delays, an injunction requiring expedited claims processing would necessarily challenge some of these regulations,

and any such challenge is reviewable only in the Federal Circuit.

 35. Plaintiffs also argue they are entitled to relief under the APA for the delays in claims adjudications. In assessing whether agency action has been unreasonably delayed pursuant to § 706 of the APA, courts look to the *TRAC* factors.[5] *See* III.D.1., *supra*. Although the delays faced by veterans, especially during the appeals process, are significant, the *TRAC* factors militate against a finding of unreasonableness. The first and second factors, dealing with the "rule of reason" and any Congressional timetable or indication of the speed with which the agency should act, favor neither a finding of reasonableness nor unreasonableness. Various statutes admonish the VA to adjudicate benefits claims and appeals in a timely manner. *See, e.g.*, 38 U.S.C. § 7101 (statutory duty to hire sufficient personnel to process appeals at the BVA in a timely manner); 38 U.S.C. § 5109B (statutory duty to resolve remands in expeditious manner). These statutes, rather than providing meaningful signposts for what constitutes a reasonable time, however, instead beg the question. This conclusion is reinforced by the fact that Congress specifically did not include any fixed time limits for the adjudication of veterans benefits claims, an act of which it is perfectly capable and which would definitively and immediately remedy the delays. *Cf. Heckler v. Day*, 467 U.S. 104, 117–18, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984) (stating "[i]n light of Congress' continuing concern that mandatory deadlines would subordinate quality to timeliness, and its recent efforts to ensure the quality of agency determinations, it hardly could have been contemplated that courts should have authority to impose the very deadlines it repeatedly has rejected").[6]

---

**5.** It is uncontested the adjudication of benefits claims is a discrete agency action that the VA

is required to take. *Norton*, 542 U.S. at 64, 124 S.Ct. 2373; 5 U.S.C. § 706.

**6.** Legislation was introduced, and rejected,

36. The third *TRAC* factor favors a finding of unreasonableness. Delays affecting human health and welfare are less tolerable than those in the sphere of economic regulation and no one can dispute that the health and welfare of veterans is at stake. For this same reason the fifth factor favors relief, as the nature and extent of the interests prejudiced by the delay could not be any more serious. The sixth factor, in which a court need not find impropriety in order to find the agency action was unreasonably delayed, also favors relief. Although the VA's track record, especially in the area of delays, is troubling, the Court has found no impropriety.

37. These factors, however, cannot overcome the fourth factor, which states that "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority." *Indep. Mining Co.*, 105 F.3d at 507 n. 7. The Court heard testimony that the current delays in the claims appeals process are, in part, the result of the VA's decision to emphasize initial claim adjudication at the expense of appeals. Findings of Fact ¶ 91. Clearly this does not fully explain the significant delays. One of the most common reasons for a claim to be remanded to an RO is the VA's failure to meet its duty to assist veterans. This is proof that internal, avoidable forces within the VA are also creating these delays. Nonetheless, given the substantial number of claims and appeals received each year by the VA, and the fact that only 11% of veterans file Notices of Disagreement after their claims are adjudicated at the RO level and only 4% of the total claims are actually pursued to a decision by the BVA, the Court finds that the fourth *TRAC* factor outweighs the others. An order by this Court requiring the VA to decrease its appeals times would necessarily impact those seeking initial benefits, as resources would be diverted from the RO level to the appellate level. As discussed elsewhere in this Order, claims adjudications at the RO level already face delays. The relief Plaintiffs seek would, in effect, divert resources from the RO level, where 88% of veterans finalize their receipt of benefits, so that the 4% to 11% of veterans who pursue appeals would face lessened delays. Given that almost 90% of veterans depend solely on the RO adjudication process for their benefits, the Court is wary of granting relief that would jeopardize the already taxed ROs. For these reasons, the *TRAC* factors do not favor a finding that the delays in the VA claims adjudication system are unreasonable. This conclusion is consistent with the Supreme Court's warning to district courts that the "prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with … congressional directives is not contemplated by the APA." *Norton*, 542 U.S. at 66, 124 S.Ct. 2373.

38. Plaintiffs also assert that the "[d]elays and waiting times for applicants and recipients filing SCDDC claims or appeals are so lengthy as to constitute an unconstitutional deprivation of property under the Due Process Clause." Proposed Order ¶ 7. Recipients of statutorily-entitled compensation have a property interest under the Due Process Clause in the continued receipt of such compensation. *Mathews*, 424 U.S. at 332, 96 S.Ct. 893; *Goldberg v. Kelly*, 397 U.S. 254, 261–62, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). More

during the 102st and 102nd Congresses that would have required the VA to pay interim benefits if disability and dependency claims that were not decided within 180 days. *See*

Veterans' Claims Administrative Equity Act of 1990, H.R. 5793, 101st Cong. (1990); Veterans' Claims Administrative Equity Act of 1991, H.R. 141, 102nd Cong. (1991).

importantly for present purposes, "[t]he Ninth Circuit has long held that applicants have a property interest protectible under the Due Process Clause where the regulations establishing entitlement to the benefits are ... mandatory in nature." *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir.1998).

 39. Claimants who satisfy the statutory criteria for eligibility are entitled as a matter of law to SCDDC benefits. Based on the statutory framework, many veterans have a protected property interest as applicants for and recipients of SCDDC benefits.

 40. "[T]here is no talismanic number of years or months, after which due process is automatically violated." *Coe v. Thurman*, 922 F.2d 528, 531 (9th Cir.1990). "In determining when due process is no longer due process because past due, the influence of other significant circumstances is not to be ignored." *Wright v. Califano*, 587 F.2d 345, 354 (7th Cir. 1978). "Delay is a factor but not the only factor." *Id.* Although the delays in claims adjudication are significant, the Court, in light of many of the factors creating these delays, cannot conclude that the due process rights of veterans are being violated. The court's discussion in *Wright* of delays in the Social Security Administration context is illuminating. The court stated:

> In view of the reasons for delay, nationwide in scope, not individualized, and the nature of particular benefits, a judicial fiat cannot help the SSA or claimants. Although judicial intervention may be required at some point, the solution must come from the SSA itself with the assistance of Congress. To impose on the SSA the crash review program sought by plaintiffs could be expected to result in a deterioration of the quality of the review, and possibly more injustice to claimants than justice.

*Wright*, 587 F.2d at 356. The Court finds this reasoning applicable to the present case. *See also Fed'l Trade Comm'n v. Weingarten*, 336 F.2d 687, 692 (5th Cir. 1964) (holding that "it would be the extremely rare case where a Court would be justified in holding ... that the passage of time and nothing more presents an occasion for the peremptory intervention of an outside Court in the conduct of an agency's adjudicative proceedings").

### 5. Claims Adjudication Process

41. Plaintiffs assert that the claims adjudication process violates the due process rights of veterans, stating:

> Given the adversarial and complicated nature of the VA claims processes, the unavailability or lack of utilization of basic procedural protections, such as a right to a pre-decisional hearing and the right to discovery, both alone and in combination with the inability to retain paid counsel at the Regional Office level, constitute an independent violation of the Due Process Clause.

Proposed Order ¶ 8.

42. VA regulations state:

> Every claimant has the right to written notice of the decision made on his or her claim, the right to a hearing, and the right of representation. Proceedings before VA are ex parte in nature, and it is the obligation of VA to assist a claimant in developing the facts pertinent to the claim and to render a decision which grants every benefit that can be supported in law while protecting the interests of the Government.

38 C.F.R. § 3.103. In addition, 38 U.S.C. § 5904(c) prohibits paid counsel at the RO level. Once the veteran files a notice of disagreement with an RO decision, the veteran may then retain paid counsel.

42. To begin, the Court notes that in the Motion to Dismiss Order, the Court cited a case from the Federal Circuit in support of the proposition that the claims adjudication system, although designed to be non-adversarial, had shifted towards an adversarial system. *See* Mot. to Dismiss Order at 32 (stating "[t]he Federal Circuit, which has exclusive appellate jurisdiction under the VJRA, has recognized [a] de-facto shift towards an adversarial system") (citing *Bailey v. West*, 160 F.3d 1360 (Fed. Cir.1998) (en banc)). In *Bailey*, the court stated:

> Since the Veterans' Judicial Review Act ..., it appears the system has changed from a nonadversarial, ex parte, paternalistic system for adjudicating veterans' claims, to one in which veterans ... must satisfy formal legal requirements, often without the benefit of legal counsel, before they are entitled to administrative and judicial review.

*Bailey*, 160 F.3d at 1365 (internal citations and quotation marks omitted). Based on this assessment, this Court permitted Plaintiffs' due process challenge to the VA claims adjudication system to proceed, noting, "[i]f the VA claims adjudication process were truly non-adversarial, then Plaintiffs' due process claim would be on shaky ground." Mot. to Dismiss Order at 32.

43. Four years after *Bailey*, the Federal Circuit clarified its holding, stating that the "veterans' benefits system remains a non-adversarial system when cases are pending before the Veterans' Administration," while the "Court of Appeals for Veterans Claims' proceedings are not non-adversarial." *Forshey v. Principi*, 284 F.3d 1335, 1355 (Fed.Cir.2002) (en banc) (superceded by statute on other grounds by Pub.L. No. 107–330, § 402(a), 116 Stat. 2820, 2832 (2002)). Thus, according to the Federal Circuit, the process at the RO level remains non-adversarial.

44. Nonetheless, Plaintiffs challenge the absence of triallike proceedings and assert that the current system violates veterans' due process rights. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. In evaluating whether a procedure satisfies Due Process, courts balance (1) the private interest, (2) the risk of erroneous deprivation and the probable value, if any, of extra safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or procedural requirement would entail. *Id.* Although "[p]rocedural due process requires adequate notice and an opportunity to be heard," *Kirk*, 927 F.2d at 1107, it does not "always require an adversarial hearing." *Hickey*, 722 F.2d at 549. "The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy." · *Landon v. Plasencia*, 459 U.S. 21, 34–35, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

45. Under the *Mathews* factors, the current system for adjudicating veterans' SCDDC claims satisfies due process. It is without doubt that veterans and their families have a compelling interest in receiving disability benefits and that the consequences of erroneous deprivation can be devastating. In looking at the totality of SCDDC claims, however, the risk of erroneous deprivation is relatively small. 11% of veterans file Notices of Disagreement upon adjudication of their claims by ROs. Only 4% proceed past the NOD to a decision by the BVA. Thus, while the avoidable remand rates at the VA are extraordinari-

ly high,[7] only 4% of veterans who file benefits claims are affected. Plaintiffs here "confront the constitutional hurdle posed by the principle enunciated in cases such as *Mathews* to the effect that a process must be judged by the generality of cases to which it applies, and therefore, process which is sufficient for the large majority of a group of claims is by constitutional definition sufficient for all of them." *Walters v. Nat'l Ass'n of Radiation Survivors,* 473 U.S. 305, 330, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985).

46. Moreover, although the additional safeguards Plaintiffs seek would likely reduce the number of avoidable remands and erroneous deprivations, the fiscal and administrative burdens of these additional procedural requirements are significant. Plaintiffs seek, in essence, to transform the claims adjudication process at the RO level from an ostensibly non-adversarial proceeding into one in which the full panoply of trial procedures that protects civil litigants is available to veterans. For example, Plaintiffs seek the general right of discovery, including the power to subpoena witnesses and documents, the ability to examine and cross-examine witnesses, the ability to pay an attorney, and the right to a hearing.[8] Implementation and maintenance of such a system would be costly in terms of the resources and manpower that the VA would need to commit to the RO proceedings.

47. The Supreme Court addressed a similar challenge to the VA benefits adjudication process in *Walters,* 473 U.S. at 307, 105 S.Ct. 3180. There, the plaintiffs challenged the statutory fee limitation on attorneys during VA benefits proceedings.

*Id.* at 307, 105 S.Ct. 3180. The Court, after noting that "the [benefit adjudication] process here is not designed to operate adversarially," *id.* at 330, 105 S.Ct. 3180, held that, "[e]specially in light of the Government interests at stake," the limit on attorneys fees did not violate the Due Process Clause. *Id.* at 334, 105 S.Ct. 3180. In so doing, the Court noted the high showing necessary to "warrant upsetting Congress' judgment that this is the manner in which it wishes claims for veterans' benefits adjudicated." *Id.* Although it might seem anomalous, as one witness candidly suggested at trial, that criminal defendants and undocumented immigrants are permitted to pay attorneys at their initial proceedings while veterans are prohibited from doing the same, Congress has nonetheless seen fit to establish such a system and this Court, so long as the system does not violate the Constitution, is powerless to alter it. *See also Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460, (1978) (stating:

> Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. But such circumstances, if they exist, are extremely rare.)

48. For these reasons, the Court finds that the SCDDC benefits adjudication pro-

---

7. The avoidable remand rate measures remands from the BVA to the ROs where the RO made an error in the initial adjudication of the claim. The current rate is between 19% and 44%. Findings of Fact ¶ 102.

8. The Court notes that veterans currently have the right to a hearing before an RO. 38 C.F.R. § 3.103(c) ("Upon request, a claimant is entitled to a hearing at any time on any issue involved in a claim ...").

cess does not violate the Due Process Clause.

### 6. Right of Access the Courts

49. Plaintiffs assert that the lack of adequate procedural protections for veterans in the SCDDC claims process deprives claimants of meaningful access to the courts and of their right to redress grievances in violation of the First Amendment and the Due Process Clause. Plaintiffs argue that the cumulative effect of foreclosing the opportunity to subpoena witnesses and records, disallowing payment of counsel, and requiring veterans to rely on non-neutral VBA service representatives denies veterans any meaningful opportunity to litigate their appeals at the CAVC and the Federal Circuit.

50. A forward-looking denial of access claim requires "an arguable underlying claim and present foreclosure of a meaningful opportunity to pursue that claim." *Broudy*, 460 F.3d at 121 (relying on *Lewis v. Casey*, 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), and *Christopher v. Harbury*, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413).

51. Plaintiffs' claim is foreclosed by *Walters*, 473 U.S. at 305, 105 S.Ct. 3180, and by this Court's finding that the SCDDC benefits adjudication process does not violate the Due Process Clause.

52. In the present case, as in *Walters*, "the asserted First Amendment interest is primarily the individual interest in best prosecuting a claim...." *Walters*, 473 U.S. at 335, 105 S.Ct. 3180. The Court in *Walters*, however, rejected the notion that there was a meaningful distinction between the plaintiffs' due process claims

and their First Amendment claim, stating, "appellees' First Amendment arguments, at base, are really inseparable from their due process claims." *Id.* Accordingly, the appellees' "First Amendment claim ha[d] no independent significance" from the due process claims. *Id.* The same analysis is directly applicable to the present action. For these reasons, Plaintiffs' right of access claim is without merit.

### 7. Extraordinary Awards Procedure

53. Plaintiffs assert that the informal adoption of the Extraordinary Awards Procedure ("EAP") by C & P, as described in the Findings of Fact ¶¶ 111–13, *supra*, deprives veterans with claims that would result in a retroactive payment of at least eight years of benefits or a payment of more than $250,000 of their property interest in the receipt of SCDDC benefits under the Due Process Clause.[9]

54. A brief review of the EAP: C & P is an organization within the VA's central office in Washington, D.C., that is responsible for setting the policies governing adjudication of SCDDC claims. Although C & P is not empowered to decide claims, it does convey policies and procedures to ROs by publishing manuals. When there are changes to a procedure within a manual, C & P issues "Fast Letters" to RO directors. In Fast Letter 07–19, dated August 27, 2007, C & P outlined the EAP. This procedure is not specified in any statute or regulation. The procedure directs ROs to send the claims folders for all cases meeting the criteria[10] to C & P for a concurring opinion before the benefit award is given to the veteran. C & P reviews only the granting of such claims by ROs, not denials, and veterans are not

---

9. A similar challenge to the EAP is now pending in the Federal Circuit. *See Military Order of the Purple Heart v. Sec'y of Veterans Affairs*, Docket No. 2008–7076 (Fed.Cir.).

10. Claims that would result in a retroactive payment of at least eight years of benefits or a payment of more than $250,000 are reviewed by C & P.

notified that their claims are reviewed pursuant to this procedure. C & P has reviewed approximately 800 rating decisions and almost all of these reviews resulted in a reduction of the proposed benefits.[11]

55. The Secretary of the VA may delegate the "authority to act and to render decisions, with respect to all laws administered by the Department, to such officers and employees as the Secretary may find necessary." 38 U.S.C. § 512(a). In addition, the "Secretary has authority to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws, including ... the manner and form of adjudications and awards." 38 U.S.C. § 501(a). In delegating authority for benefits adjudication, the following regulation was promulgated:

> Authority is delegated to the Under Secretary for Benefits and to supervisory or adjudicative personnel within the jurisdiction of the Veterans Benefits Administration designated by the Under Secretary to make findings and decisions under the applicable laws ... as to entitlement of claimants to benefits under all laws administered by the [VA] governing the payment of monetary benefits to veterans and their dependents, within the jurisdiction of [C & P].

38 C.F.R. § 3.100.

56. As a threshold matter, Defendants argue that Plaintiffs have failed to demonstrate that any of their members have been affected or will be affected by the EAP. As Defendants concede, however, a veteran whose benefit award is reviewed by C & P is never told of this review process. Thus, for example, a veteran's benefit may initially be set at $275,000 by the RO. Because the award is greater than $250,000, however, the EAP is triggered

and, before the veteran is notified of this award, his claim folder is sent to C & P. Hypothetically, C & P might then reduce the award to less than $250,000. The veteran would subsequently be granted the benefit without ever knowing that his award had been reduced by C & P, or even that the benefit award had initially qualified for EAP. As veterans have no way of knowing whether their benefits were affected by the EAP, Plaintiffs have no way of demonstrating that any of their members were adversely affected. For present purposes, the Court is confident that Plaintiffs have standing to pursue this claim, which the Court discusses in the following Conclusion of Law, ¶ 57.

57. Plaintiffs argue that, in essence, the EAP is an extra-judicial process that the VA has added to the benefits adjudication system in an effort to strip veterans of benefits that have already been determined by the RO. As the above-cited statutory language indicates, Congress provided the Secretary of the VA with wide discretion in determining how benefits are to be determined. *See* 38 U.S.C. § 512(a). Against this backdrop, the Court is forced to conclude that the EAP is an internal management directive that merely establishes the procedures by which a certain class of benefits claims is reviewed. The EAP is essentially an auditing mechanism implemented by the VA to ensure that these types of awards are accurately adjudicated. Such a procedure does not offend due process.

## VI. POST–TRIAL HEARING

On June 10, 2008, after the close of evidence, the Court held a hearing regarding newly discovered evidence. Docket Nos. 236, 237. The evidence was an email sent by the PTSD Program Coordinator of

---

**11.** These facts are taken from the Findings of Fact, ¶¶ 111–13, *supra.*

the Central Texas Veterans Health Care system, Dr. Norma Perez, to her colleagues. Plaintiffs apparently were provided the email by a Washington D.C.-based non-profit organization, which had procured the email through a Freedom of Information Act ("FOIA") request.[12] *See* Pls.' Letter to Court, Docket No. 231.

At the hearing, the Court permitted the email to be entered into evidence and hereby designates the email Plaintiffs' Trial Exhibit 1347. In addition, Plaintiffs requested that the Court enter into evidence the transcript from a June 4, 2008, hearing held by the Senate Committee on Veterans Affairs. This hearing had been convened by the Senate Committee to address the above-described email. At the Senate hearing, testimony was received from Dr. Norma Perez, Dr. Michael Kussman, Under Secretary for Health, Dr. Katz, Deputy Chief of Patient Care Services Office of Mental Health for the VA, and Admiral Patrick Dunne, Acting Under Secretary for Benefits. The Court entered the transcript for this hearing into evidence and hereby designates it Plaintiffs' Trial Exhibit 1348.

The email at issue contains the subject "Suggestion," and states:

> Given that we are having more and more compensation[-]seeking veterans, I'd like to suggest that you refrain from giving a diagnosis of PTSD straight out. Consider a diagnosis of Adjustment Disorder, R/O [Rule Out] PTSD.

> Additionally, we really don't or [sic] have time to do the extensive testing that should be done to determine PTSD.

> Also, there have been some incidence [sic] where the veteran has a C & P is not given a diagnosis of PTSD, then the

veteran comes here and we give the diagnosis, and the veteran appeals his case based on our assessment.

> This is just a suggestion for the reasons listed above.

Ex. 1347.

At the hearing, Plaintiffs argued that the email was compelling evidence of the VA's failure and/or refusal to properly diagnose and treat PTSD. In addition, Plaintiffs argued that without further discovery, it would be impossible to know for sure whether similar directives or "suggestions" were being followed at other medical centers. According to Plaintiffs, this email could likely lead to further evidence of a systemic denial of PTSD care to veterans.

The Court denied Plaintiffs' request to reopen discovery, noting that the evidentiary record was closed except for the limited purpose of admitting the email at issue and the Senate testimony transcript and evaluating the import of their contents.

Dr. Perez is one minor supervisor in a bureaucracy of 230,000 employees. At the time of the email, Dr. Perez had less than a year in her position at the VA and the email she sent had limited distribution. Although the message Dr. Perez's email conveys is troubling, the Court concludes that the email is not enough to alter the fact that Plaintiffs have failed to demonstrate systemic denials of health care and benefits and that, absent proof of systemic problems, the Court is unable to grant the relief requested by Plaintiffs.

## VII. *CONCLUSION*

The remedies sought by Plaintiffs are beyond the power of this Court and would call for a complete overhaul of the VA

---

**12.** It is unclear to the Court why this email was not produced by Defendants prior to the trial.

system, something clearly outside of this Court's jurisdiction. For the reasons stated above, the Court DENIES Plaintiffs' request for a permanent injunction and GRANTS judgment in favor of Defendants.

IT IS SO ORDERED.